FILED
United States Court of Appeals
Tenth Circuit

November 15, 2011

Elisabeth A. Shumaker
Clerk of Court

PUBLISH

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

EUGENE S.,

     Plaintiff - Appellant,

v.

HORIZON BLUE CROSS BLUE
SHIELD OF NEW JERSEY,

     Defendant - Appellee.

No. 10-4225

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH
(D.C. No. 09-CV-00101-DS)**

---

Brian King, Salt Lake City, Utah, for Plaintiff - Appellant.

Mary Wood of Wood, Jenkins, L.L.C., Salt Lake City, Utah, for Defendant - Appellee.

---

Before **KELLY**, **LUCERO**, and **GILMAN**[*], Circuit Judges.

---

**KELLY**, Circuit Judge.

---

     Plaintiff-Appellant Eugene S. appeals from the district court's denial of his

---

[*] The Honorable Ronald Lee Gilman, United States Circuit Court Judge, Sixth Circuit, sitting by designation.

motion to strike and entry of summary judgment in favor of Defendant-Appellee Horizon Blue Cross Blue Shield of New Jersey ("Horizon BCBSNJ" or "Horizon"). We have jurisdiction under 28 U.S.C. § 1291, and we affirm.

Background

Eugene S. sought coverage for his son A.S.'s residential treatment costs from his employer's ERISA benefits insurer. Aplt. App. 1-6. Horizon's delegated third-party plan administrator, Magellan Behavioral Health of New Jersey, LLC ("Magellan"), originally denied the claim and explained that Mr. S.'s son qualified for intensive outpatient treatment, but not for residential treatment. Magellan affirmed its initial denial of residential treatment benefits through several appeals by both Mr. S. and the residential treatment center. On Mr. S.'s final appeal, Magellan approved and provided benefits for residential treatment between August 10 and November 2, 2006, but reiterated that Mr. S.'s son qualified for intensive outpatient treatment only between November 3, 2006 and June 12, 2007, and refused residential treatment benefits during that period. Id. Having exhausted his administrative appeals, Mr. S. filed this action challenging Horizon's denial of benefits under ERISA (29 U.S.C. § 1132(a)(1)(B)), on July 24, 2009. Id.

Mr. S. and Horizon filed cross-motions for summary judgment on July 6, 2010. Aplt. App. 12-13, 56-58. That same day, Horizon also filed a declaration,

including the terms of Horizon's delegation of authority to Magellan to administer mental health claims in a Vendor Services Agreement ("VSA"). Aplt. App. 95a-134a. Mr. S. moved to strike that declaration as procedurally barred and untimely. Aplt. App. 238-244a. The district court denied the motion to strike, Aplt. App. 337-43, and granted Horizon summary judgment, Aplt. App. 323-36. The district court held that an "arbitrary and capricious" standard of review applied, and that neither Horizon nor Magellan had acted in an arbitrary or capricious manner in denying the contested claim. Aplt. App. 327-36.

On appeal, Mr. S. makes three arguments: first, that the district court erred by denying his motion to strike and allowing the VSA into evidence. Aplt. Br. 28-36. Second, that the district court erred in reviewing Horizon's[1] denials of benefits under an arbitrary and capricious, rather than a de novo, standard. Aplt. Br. 36-45. Third, that Horizon improperly denied him benefits under the terms of his ERISA benefits plan. Aplt. Br. 46-60.

---

[1] Mr. S., throughout his trial and appellate briefing, refers to Horizon as the entity that denied him benefits under the ERISA plan. In reality, it was Horizon's delegate, Magellan, which made determinations regarding both claims and appeals for benefits. For ease of discussion, we construe Mr. S.'s allegations against "Horizon" as allegations against Horizon and/or Magellan throughout this opinion.

## Discussion

I.     Motion to Strike

Mr. S. contends that the district court erred by refusing to strike the VSA and by concluding that its admission would be harmless. Aplt. Br. 28. Mr. S. does not challenge, and has never challenged, the authority of Magellan to act as third-party plan administrator on behalf of Horizon. Our case law recognizes that such delegations occur without altering the applicable standard of review. Geddes v. United Staffing Alliance Emp. Med. Plan, 469 F.3d 919, 926 (10th Cir. 2006); Gaither v. Aetna Life Ins. Co., 394 F.3d 792, 801 (10th Cir. 2004).

We review the denial of a motion to strike for abuse of discretion. Jones v. Barnhart, 349 F.3d 1260, 1270 (10th Cir. 2003). Mr. S.'s argument that the district court erred in considering evidence outside the administrative record is without merit. We have cautioned against too broad of a reading of our precedent regarding supplementation of an ERISA administrative record. Murphy v. Deloitte & Touche Group Ins. Plan, 619 F.3d 1151, 1157-59 (10th Cir. 2010). Although supplementation regarding eligibility for benefits is not permitted, supplementation is allowed for assessing dual-role conflict of interest claims. Id. at 1162. Given that Mr. S. asserted a dual-role conflict of interest against a plan administrator, Aplt. App. 31-33, the district court certainly was not prohibited from supplementing the administrative record with the VSA.

Mr. S. next argues that, even if the district court had authority to

supplement the record with the VSA, the VSA should have been disclosed as part of Rule 26 initial disclosures, and certainly prior to a motion for summary judgment. Fed. R. Civ. P. 26(a)(1)(A); Aplt. Br. 28-36. He contends that the proper remedy for such a failure to disclose is exclusion of the evidence from the proceedings. Fed. R. Civ. P. 37(c)(1); Aplt. Reply Br. 12. Horizon contends that ERISA appeals are exempt from initial disclosure requirements under Rule 26 as "action[s] for review on an administrative record." Fed. R. Civ. P. 26(a)(1)(B)(i). We need not weigh in on this dispute because we agree with the district court that, even if Horizon should have disclosed the VSA earlier, any error would be harmless or justified in the present case.

Whether a failure to disclose is harmless and/or justified under Rule 37 depends upon several factors that a district court should consider in exercising its discretion. Woodworker's Supply, Inc. v. Principal Mut. Life Ins. Co., 170 F.3d 985, 993 (10th Cir. 1999). These factors include: "(1) the prejudice or surprise to the party against whom the testimony is offered; (2) the ability of the party to cure the prejudice; (3) the extent to which introducing such testimony would disrupt the trial; and (4) the moving party's bad faith or willfulness." Id. According to the district court, no evidence of bad faith or willfulness existed, and Mr. S. should not have been surprised that an agreement between Horizon and Magellan existed, given that each letter denying benefits explained as much. Aplt. App. 340. Nor was there any evidence that admitting the VSA would be

- 5 -

disruptive to the litigation process. The district court also noted that Mr. S. "never requested a copy of the [VSA] in discovery or otherwise." Aplt. App. 341.

The district court permissibly exercised its discretion. The VSA became relevant given Mr. S.'s claim of a dual-role conflict. Before that, there was no reason for Horizon or Magellan to enter the VSA into the administrative record. The district court could not hope to evaluate that alleged conflict without the VSA. Because our case law allows for the introduction of supplemental evidence relating to a dual-role conflict, and because Horizon's failure to disclose the VSA under Rule 26 was harmless to Mr. S., justified by Mr. S.'s allegation, or both, we will not overturn the district court's ruling.

II.     Standard of Review for Denial of Benefits

Mr. S. argues that the appropriate standard of review is de novo. He further argues that, even if we decide that the appropriate standard of review is arbitrary and capricious, we must alter that standard based on Horizon's structural, or dual-role, conflict of interest. Aplt. Br. 36-45. If we determine that de novo review is appropriate, we need not consider whether a dual-role conflict should affect our analysis. We address Mr. S.'s arguments in turn.

Our review of orders granting summary judgment is de novo, applying the same standard as the district court. LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan, 605 F.3d 789, 795 (10th Cir. 2010). Here, the parties submitted this issue on cross-motions for

summary judgment, and we must determine, without deference to the district court, what the standard of review should be.  Id. at 796.

A.    Whether Horizon is Entitled to Deferential Review

"'[A] denial of benefits' covered by ERISA 'is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.'" Id. at 796 (quoting Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115 (1989)).  "Where the plan gives the administrator discretionary authority, however, 'we employ a deferential standard of review, asking only whether the denial of benefits was arbitrary and capricious.'" Id. at 796 (quoting Weber v. GE Group Life Assurance Co., 541 F.3d 1002, 1010 (10th Cir. 2008)). "Under this arbitrary-and-capricious standard, our 'review is limited to determining whether the interpretation of the plan was reasonable and made in good faith.'" Id. at 796 (quoting Kellogg v. Metro. Life Ins. Co., 549 F.3d 818, 825-26 (10th Cir. 2008)).  De novo review is the default position; the "burden to establish that this court should review its benefits decision . . . under an arbitrary-and-capricious standard" falls upon the plan administrator.  Id. at 796 (citing Gibbs ex rel. Estate of Gibbs v. CIGNA Corp., 440 F.3d 571, 575 (2d Cir. 2006)).

Our analysis generally turns on a review of plan language to determine whether that language grants discretion to the plan administrator in reviewing benefits claims.  Mr. S. argues, however, that a recent Supreme Court case,

- 7 -

CIGNA Corp. v. Amara, 131 S. Ct. 1866 (2011), makes our analysis more complex. Specifically, Mr. S. argues that, under Amara, "while SPDs advise participants and beneficiaries of their rights and obligations about [*sic*] the ERISA plan, those SPDs are not itself [*sic*] part of the plan." Aplt. Reply Br. 18 (citing Amara, 131 S. Ct. at 1876-78). Mr. S. essentially makes one or both of two arguments: (1) because the record does not include "the documents that actually govern the plan, and from which the SPD is derived," we cannot verify that any discretion granted by the SPD is valid; and/or (2) "the grant of discretionary authority aris[ing] only from the SPD," without more, is insufficient. Aplt. Reply Br. 19. We think Mr. S. reads Amara too broadly.

In Amara, the Supreme Court specifically considered whether a district court could enforce terms in an SPD where those terms conflicted with the terms in governing plan documents. Amara, 131 S. Ct. at 1876-78 (reviewing whether plan participants could "recover benefits based on faulty disclosures"). In that context, the Court rejected the notion that terms in an SPD "necessarily may be enforced . . . as the terms of the plan itself" for several reasons: (1) statutory language "suggests that the information *about* the plan provided by those disclosures is not itself *part of* the plan;" (2) enforcing SPD terms would allow the plan administrator to effectively control "the basic terms and conditions of the plan," which is a power of the plan sponsor (where those roles are not filled by the same entity); and (3) making SPD terms enforceable might lead drafters to use

more complex language in an attempt to fully describe the provisions of the plan, in frustration of ERISA's "basic [SPD] objective: clear, simple communication." Id. at 1877.

We interpret Amara as presenting either of two fairly simple propositions, given the factual context of that case: (1) the terms of the SPD are not enforceable when they conflict with governing plan documents, or (2) the SPD cannot create terms that are not also authorized by, or reflected in, governing plan documents. We need not determine which is the case here, though, because the SPD does not conflict with the Plan or present terms unsupported by the Plan; rather, it *is* the Plan.

Our colleagues in other circuits have consistently held that an SPD can be part of the Plan. See, e.g., Pettaway v. Teachers Ins. & Annuity Ass'n of Am., 644 F.3d 427, 434 (D.C. Cir. 2011); Heffner v. Blue Cross & Blue Shield of Ala., Inc., 443 F.3d 1330, 1342-43 (11th Cir. 2006); Bergt v. Ret. Plan for Pilots Employed by MarkAir, Inc., 293 F.3d 1139, 1143 (9th Cir. 2002). However, an insurer is not entitled to deferential review merely because it claims the SPD is integrated into the Plan. Rather, the insurer must demonstrate that the SPD is part of the Plan, for example, by the SPD clearly stating on its face that it is part of the Plan. A contrary decision would undermine Amara.

Without first determining that the SPD was part of the Plan, the district court improperly relied on the language of the SPD. We overlook this error

because the SPD does unequivocally state that it is part of the Plan, but the better practice is to proceed in the appropriate order of determination.

The SPD clearly states in the Introduction that it, along with the individual "Certificate of Coverage . . . form[s] [the] Group Insurance Certificate;" that it "is made part of the Group Policy;" and that "[a]ll benefits are subject in every way to the entire Group Policy, which includes" the SPD. Aplee. Supp. App. 6. Nearly identical language is found in the Certificate of Coverage. Aplee. Supp. App. 7. Although Mr. S. argues that he does not have access to the governing plan documents and cannot determine if such governing documents conflict with any grant of authority present in the SPD, Aplee. Br. 37-38, he did not request a copy of any such documents during the administrative appeal process or in discovery. Nor did he ask the district court to delay ruling on cross-motions for summary judgment so that he could seek out any such documents. Meanwhile, at oral argument, Horizon's counsel maintained that the only plan document not in evidence has no bearing on the discretion afforded to Horizon and is irrelevant to the present case.[2] Thus, the SPD—which contains the language of the Plan—is sufficient for our review.

Given that the language in the SPD is also the language of the Horizon

---

[2] Counsel assured the court that the only plan document that is not in evidence—the "Group Policy" or "Group Certificate"—relates solely to the relationship between Horizon as plan administrator and Mr. S.'s employer as plan sponsor, and has no bearing on Horizon's discretion in reviewing claims. (Oral Arg. 15:00 to 16:52).

Plan, we next proceed to analyze that language and determine whether it grants Horizon discretion in reviewing benefits claims. "We have been comparatively liberal in construing language to trigger the more deferential standard of review under ERISA." Nance v. Sun Life Assurance Co. of Canada, 294 F.3d 1263, 1268 (10th Cir. 2002) (collecting cases). For example, we have found arbitrary and capricious review appropriate where plan language defines "needed" services as those determined by the plan administrator to meet certain tests, McGraw v. Prudential Ins. Co. of Am., 137 F.3d 1253, 1256 (10th Cir. 1998), or where plan language entitles the plan administrator to label a procedure "experimental," Chambers v. Family Health Plan Corp., 100 F.3d 818, 825 (10th Cir. 1996).

We find several instances of Plan language sufficient to grant Horizon discretion in reviewing benefits claims. The Plan limits "Medically Necessary and Appropriate" services or supplies to those "determined by Horizon BCBSNJ's medical director or designee(s)" to be such, and clarifies that a prescription, order, recommendation, or approval from a practitioner does not, without Horizon's approval, make a supply or service "medically necessary." Aplee. Supp. App. 20-21. The Plan limits payment for benefits to services that, "in [Horizon's] judgment, are provided at the proper level of care." Aplee. Supp. App. 48. The Plan reserves to Horizon the "right to require that care be rendered in an alternate setting as a condition of providing payment for benefits" if Horizon "determines that a more cost-effective manner exists." Aplee. Supp.

- 11 -

App. 49. The Plan also reiterates, in all-capital letters, that "Horizon BCBSNJ determines what is medically necessary and appropriate" under its Utilization Review and Management program. Aplee. Supp. App. 70. Given Mr. S.'s concession that "the language of the Horizon policy may qualify as granting discretion when compared with the language at issue in Tenth Circuit precedent," Aplt. Br. 41 (citing Nance, 294 F.3d at 1267), and in light of this court's holdings in McGraw and Chambers, we find that Horizon is entitled to deferential review based on the language of the Plan.

We also note that, to the extent we are required (under de novo review) to determine whether Magellan also is entitled to deferential review, language in the Plan grants discretion to Magellan as well. The Plan defines "Care Manager" as "[a] person or entity designated by Horizon BCBSNJ to manage, assess, coordinate, direct and authorize the appropriate level of health care treatment." Aplee. Supp. App. 10. The Plan also provides different levels of coverage depending on whether the Care Manager authorizes, or does not authorize, treatment for mental illnesses. Aplee. Supp. App. 53. Thus, even if Geddes and Gaither did not control our analysis of Magellan's discretion, the Plan also grants discretion to Magellan. We therefore find that, to the extent we must independently assess the deference to which Magellan is entitled, Magellan is entitled to deferential review.

B.     Whether Horizon Suffers from a Conflict of Interest

- 12 -

Mr. S. argues that, even if Horizon is entitled to deferential review, we must reduce our deference in proportion to Horizon's dual-role conflict of interest. Specifically, Mr. S. argues that, because "Horizon is an insurer, competing with other insurers in an open market place[,] . . . [t]he pressure on Horizon to keep payment of claims as low as possible so as to compete successfully with its health insurance peers is significant." Aplt. Br. 44-45. Mr. S. also cites Metropolitan Life Insurance Co. v. Glenn, 554 U.S. 105 (2008), for the proposition that, even if the VSA and its delegation of authority to Magellan may be considered, "a conflicted ERISA fiduciary does not remove or dilute its conflict of interest by delegating responsibility to administer a plan to a third party." Aplt. Br. 45 (citing Glenn, 554 U.S. at 113-15). Mr. S.'s reliance on Glenn is misplaced.

In Glenn, the Supreme Court recognized that a conflict exists where an employer funds its own benefits plan, and may exist even where an employer hires an insurance company to administer such a plan. Glenn, 554 U.S. at 112-14. But Glenn did not assert that insurance companies necessarily suffer from conflicts of interest when hired by plan sponsors; the Court instead said that an employer's conflict "*may* extend to its selection of an insurance company" as plan administrator. Id. at 114 (emphasis added). Even if we assume that this employer conflict extends to Horizon, as an insurer, Glenn did not address a situation in which an insurer delegates its authority to review claims to an independent third-

party plan administrator. Such a delegation can mitigate what otherwise would be a dual-role conflict of interest. Finley v. Hewlett-Packard Co. Empl. Benefits Org. Income Prot. Plan, 379 F.3d 1168, 1176 (10th Cir. 2004). Asserting a conflict based on a generalized economic incentive, such as attracting more business through the denial of claims, without more, is "insufficient to rise to the level of a legally cognizable conflict of interest." Id. (citing Pitman v. Blue Cross & Blue Shield of Okla., 217 F.3d 1291, 1296 (10th Cir. 2000)). We therefore review Horizon's denial of benefits under a "pure" arbitrary and capricious standard.

III.    Denial of Benefits

Using the arbitrary and capricious standard, "we ask whether the administrator's decision was 'reasonable and made in good faith.'" Phelan v. Wyo. Associated Builders, 574 F.3d 1250, 1256 (10th Cir. 2009) (quoting Flinders v. Workforce Stabilization Plan of Phillips Petroleum Co., 491 F.3d 1180, 1193 (10th Cir. 2007)). We will uphold the decision of the plan administrator "so long as it is predicated on a reasoned basis," and "there is no requirement that the basis relied upon be the only logical one or even the superlative one." Adamson v. UNUM Life Ins. Co. of Am., 455 F.3d 1209, 1212 (10th Cir. 2006) (citing Kimber v. Thiokol Corp., 196 F.3d 1092, 1098 (10th Cir. 1999)). We look for "substantial evidence" in the record to support the administrator's conclusion, meaning "more than a scintilla" of evidence "that a

reasonable mind could accept as sufficient to support a conclusion." Id.

A.     Substantial Evidence

The parties address whether Magellan erred in denying benefits under its "continued stay" criteria. They focus most of their discussion on the first of five criteria for a covered continued stay, as do we.

The first criterion for continued stay essentially requires that a plan participant (1) still suffer from the same problem, which remains serious enough to justify residential treatment admission; or (2) suffer from a new problem which, independently, would justify residential treatment admission; or (3) be unable to re-enter the community based on actual experience or clinical evidence.[3] To satisfy either of the first two alternatives, one must demonstrate that either the original issue(s), or a new issue, would satisfy the nine separate and explicit requirements for initial admission into a residential treatment center. Aplt. App. 371-72. Because Mr. S. has made no attempt to apply any facts to the actual requirements for admission into a residential treatment center, Aplt. Br. 46-60, Aplt. Reply Br. 22 n.2, we assume his argument rests on the third alternative. But

---

[3] The first criterion for continued stay requires that: "Despite reasonable therapeutic efforts, clinical evidence indicates at least one of the following: [(1)] the persistence of problems that caused the admission to a degree that continues to meet the admission criteria (both severity of need and intensity of service needs), *or* [(2)] the emergence of additional problems that meet the admission criteria (both severity of need and intensity of service needs), *or* [(3)] that disposition planning and/or attempts at therapeutic re-entry into the community have resulted in, or would result in exacerbation of the psychiatric illness to the degree that would necessitate continued residential treatment." Aplt. App. 372.

- 15 -

Magellan found that, as of November 3, "[t]here was no reported information" that A.S. could not care for himself due to a psychiatric disorder, nor that he required round-the-clock supervision to develop basic living skills. Aplt. App. 351. Instead, Magellan noted that A.S. "went home on a pass and did well with his parents." Aplt. App. 351. Thus, Magellan concluded that while A.S. "met criteria for continued treatment," he met those criteria for "a less restrictive level of care" to include "several hour[s] [per] day, multiple times [per] week psychiatric evaluation and treatment including counseling, education and therapeutic interventions." Aplt. App. 351. Substantial evidence in the record supports such a conclusion, including findings that A.S.'s "symptoms diminished rapidly during the first couple of months in treatment," that A.S. "was able to experience stabilization of his mood," that A.S.'s "depressive symptoms resolved within the first couple of months of treatment," and that A.S. performed well on home visits. Aplt. App. 432, 545, 551, 557.

B.    Deference to Treating Physicians

Mr. S.'s final argument is that Horizon acted in an arbitrary and capricious manner by "fail[ing] to defer to A.S.'s treating mental health clinicians." Aplt. Br. 56. Mr. S. relies upon several cases—none of which are binding on this Court—in an attempt to distinguish a clear holding from the Supreme Court: "[C]ourts have no warrant to require administrators automatically to accord special weight to the opinions of a claimant's physician; nor may courts impose

on administrators a discrete burden of explanation when they credit reliable evidence that conflicts with a treating physician's evaluation." Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003). The Supreme Court's holding in Nord is clear, and we are bound to follow it. We therefore decline Mr. S.'s invitation to announce a "treating physician rule" for ERISA claims relating to mental health care.

Mr. S. alternatively argues that Horizon and Magellan imposed a treating physician rule by requiring that "evaluation and assignment of a DSM-IV diagnosis must result from a face-to-face psychiatric evaluation" before a participant may be admitted for residential psychiatric treatment. Aplt. App. 371; see also Aplt. Br. 59-60. Thus, he argues, it is arbitrary and capricious for Horizon or Magellan to require a face-to-face psychiatric evaluation on the one hand "and then disclaim the importance of such a face-to-face psychiatric evaluation when it comes time for Horizon or Magellan to evaluate the medical necessity of treatment provided to an insured." Aplt. Br. 59-60. We disagree for two reasons. First, as Horizon suggests, "[a] psychiatric diagnosis is entirely different from a medical necessity determination." Aplee. Br. 53 n.15. Second, and again as Horizon suggests, "the Plan makes it clear to plan participants that the Plan does not follow a treating physician rule," Aplee. Br. 53 n.15, by explaining that "[t]he fact that your attending physician may prescribe, order, recommend or approve a service or supply does not, in itself, make it Medically

Necessary and Appropriate . . . or make it an eligible medical expense," Aplee. Supp. App. 48.

Finally, Mr. S. argues that Horizon and Magellan violated <u>Nord</u>'s prohibition against "arbitrarily refus[ing] to credit a claimant's reliable evidence, including the opinions of a treating physician." <u>Nord</u>, 538 U.S. at 834. We acknowledge that A.S.'s treating practitioners thought A.S. would suffer if discharged prematurely, in line with a criterion for continued stay. <u>E.g.</u>, Aplt. App. 536, 541. However, given that an administrator's basis need not "be the only logical one or even the superlative one," <u>Adamson</u>, 455 F.3d at 1212, we cannot say that Magellan acted in an arbitrary and capricious manner by instead relying on several examples of successful or relatively successful leaves of absence. <u>E.g.</u>, Aplt. App. 545, 551, 557. We find substantial evidence in the record to support Magellan's conclusion that A.S. did not meet the criteria for continued stay, and we therefore hold that neither Horizon nor Magellan acted in an arbitrary or capricious manner in denying residential treatment benefits to Mr. S. for the period of time in question.

IV.    <u>Filing Under Seal</u>

Mr. S. sought leave to file the second volume of his appendix under seal, based on the inclusion of "medical records and other documents containing personal health information and other confidential information about the parties" in that volume. A party seeking to file court records under seal must overcome a

presumption, long supported by courts, that the public has a common-law right of access to judicial records. Mann v. Boatright, 477 F.3d 1140, 1149 (10th Cir. 2007) (citing Nixon v. Warner Commc'ns, Inc., 435 U.S. 589, 599 (1978)). To do so, "the parties must articulate a real and substantial interest that justifies depriving the public of access to the records that inform our decision-making process." Helm v. Kansas, ___ F.3d ___, 2011 WL 3907126, at *13 (10th Cir. Sept. 7, 2011). Nearly every document in the volume at issue includes the name of, and/or personal and private medical information relating to, Mr. S.'s minor son. Furthermore, any document that does not contain such information would be of little use without reference to documents which do contain such information. We therefore find that Mr. S. has satisfied his heavy burden and GRANT Mr. S.'s motion to file Volume II of the Appendix under seal. See Friedland v. TIC-The Indus. Co., 566 F.3d 1203, 1205 n.1-2, 1211 (10th Cir. 2009) (permitting sealed filings relating to two confidential settlement agreements); United States v. Hunter, 548 F.3d 1308, 1317 (10th Cir. 2008) (granting motion to file a confidential law enforcement report and confidential grand jury transcripts under seal); AST Sports Sci. v. CLF Distribution Ltd., 514 F.3d 1054, 1057 n.1 (10th Cir. 2008) (granting motion to file "confidential information related to jurisdictional discovery" under seal); Proctor v. United Parcel Serv., 502 F.3d 1200, 1215 (10th Cir. 2007) (granting motion to file portion of appendix under seal in an Americans with Disabilities Act retaliation case); Ctr. for Legal

- 19 -

Advocacy v. Hammons, 323 F.3d 1262, 1273 (10th Cir. 2003) (granting motion to transmit records relating to suicides and attempted suicides of mental health care patients under seal).

AFFIRMED.