FILED
United States Court of Appeals
Tenth Circuit

October 17, 2017

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

GREGGORY B. OWINGS,

      Plaintiff - Appellant,

v.

UNITED OF OMAHA LIFE
INSURANCE COMPANY,

      Defendant - Appellee.

No. 16-3128

**APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
(D.C. No. 6:15-CV-01108-EFM)**

Donald N. Peterson, II (Sean M. McGivern, with him on the briefs), Graybill &
Hazlewood, LLC, Wichita, Kansas, appearing for Appellant.

William E. Hanna (Christopher J. Leopold, with him on the brief), Stinson
Leonard Street, LLP, Kansas City, Missouri, appearing for Appellee.

Before **BRISCOE**, **MATHESON**, and **PHILLIPS**, Circuit Judges.

**BRISCOE**, Circuit Judge.

      Plaintiff Greggory Owings sustained a disabling injury on the job and was

afforded long-term disability benefits by defendant United of Omaha Life

Insurance Company (United), under the terms of a group insurance policy issued by United to Owings' employer. Owings disagreed with, and attempted without success to administratively challenge, the amount of his disability benefits. He then filed suit against United in Kansas state court, but United removed the action to federal district court, asserting that the federal courts had original jurisdiction over the action because the policy was governed by the Employee Retirement Income Security Act of 1974 (ERISA). The district court ultimately granted summary judgment in favor of United. Owings now appeals. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we conclude that United was arbitrary and capricious in determining the date that Owings became disabled and, in turn, in calculating the amount of his disability benefits. Consequently, we reverse the district court's grant of summary judgment in favor of United and remand with directions to enter summary judgment in favor of Owings.

I

*The Policy and Plan*

Owings worked for Grene Vision Group in Wichita, Kansas, from 2001 until October 8, 2013. At all times relevant to this case, Grene was covered by a group insurance policy (Policy) issued by United. Aplt. App., Vol. I at 80. The Policy funded a welfare benefit plan (the Plan) that provided long-term disability benefits to qualifying employees of Grene.

The Policy incorporates by reference the terms of the Certificates[1] and the Summary of Coverage that were provided to Plan participants, such as Owings. Together, these documents serve as the summary plan description and plan document for the Plan. The Plan is governed by the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001, et seq.

The Policy defines the terms "Disability" and "Disabled" in the following manner:

> *Disability* and *Disabled* mean that because of an Injury or Sickness, a significant change in Your mental or physical functional capacity has occurred, as a result of which:
>
>> a) during the Elimination Period, You are prevented from performing at least one of the Material Duties of Your Regular Occupation on a part-time or full-time basis; and
>>
>> b) after the Elimination Period, You are:
>>
>>> 1. prevented from performing at least one of the Material Duties of Your Regular Occupation on a part-time or full-time basis; and
>>> 2. unable to generate Current Earnings which exceed 99% of Your Basic Monthly Earnings due to that same Injury or Sickness.
>
> After a Monthly Benefit has been paid for 3 years, *Disability* and *Disabled* mean You are unable to perform all of the Material Duties of any Gainful Occupation.

---

[1] According to the record, United issued to Grene Certificates "for delivery to each insured person," and each "Certificate describe[d] the benefits, terms, conditions, exclusions and limitation of the insurance provided under th[e] Policy." Aplt. App., Vol. II at 216.

3

Id., Vol. II at 359.

The Policy defines the terms "Material Duties," "Regular Occupation," and
"Basic Monthly Earnings," in the following manner:

> *Material Duties* means the essential tasks, functions, and operations
> relating to an occupation that cannot be reasonably omitted or
> modified. In no event will We consider working an average of more
> than the required Full-Time hours per week in itself to be a part of
> material duties. One of the material duties of Your Regular
> Occupation is the ability to work for an employer on a full-time
> basis.

Id. at 360.

> *Regular Occupation* means the occupation You are routinely
> performing when Your Disability begins. Your regular occupation is
> not limited to Your specific position held with the Policyholder, but
> will instead be considered to be a similar position or activity based
> on job descriptions included in the most current edition of the U.S.
> Department of Labor Dictionary of Occupational Titles (DOT). We
> have the right to substitute or replace the DOT with another service
> or other information that We determine to be of comparable purpose,
> with or without notice. To determine Your regular occupation, We
> will look at Your occupation as it is normally performed in the
> national economy, instead of how work tasks are performed for a
> specific employer, at a specific location, or in a specific area or
> region.

Id. at 361.

> *Basic Monthly Earnings* for salaried Employees means Your gross
> annual salary from the Policyholder in effect on the day immediately
> prior to the date on which Your Disability began, divided by 12.

Id. at 342.

The Policy defines "Full-Time" as "working the required number of hours
to be considered a full-time employee of the Policyholder." Id. at 360. And the

4

Policy states that "Actively Working, Active Work" means:

> [A]n Employee is performing the normal duties of his or her Regular Job for the Policyholder on a regular and continuous basis 30 or more hours each week. An Employee will be considered to be actively working on any day that is a regular paid holiday or day of vacation, or regular or scheduled non-working day, provided the Employee was actively working on the last preceding regular work day.

Id. at 347.

*Owings' employment with Grene and his injury*

Owings began working for Grene Vision Group in Wichita, Kansas, in 2001. As of Sunday, June 30, 2013, Owings' title at Grene was Maintenance Director and his annual salary was $83,150.00.

On the morning of Monday, July 1, 2013, Owings injured his back at work while moving a surgical chair and cabinet. The injury negatively impacted Owings' ability to lift, bend, stoop, carry, push, and pull, and resulted in Owings experiencing long-term back pain and spasms.

Later that same day, Owings met with Debbie Bratton, Grene's Director of Human Resources. Bratton informed Owings that, effective immediately, his title was changing from Maintenance Director to Maintenance Supervisor, and his annual salary was being reduced to $54,995.20 per year. During the meeting, Owings advised Bratton that he had suffered an injury while at work that morning. After the meeting, Owings left work, returned home, and did not perform any further job duties.

5

On the morning of July 2, 2013, Owings called Bratton and informed her that he was in possession of a company-provided cell phone. Owings also advised Bratton that, due to his injury, Grene would need to find someone to respond to all work-related messages that were directed to him. Because of the back injury he sustained on July 1, 2013, Owings was never on the company's premises on July 2, 2013, nor did he perform any work for Grene that day or thereafter.

*Owings' applications for disability benefits*

On July 20, 2013, Owings applied for short-term disability benefits with United. On his application form, Owings listed "July 1st 2013" as the "Date of Disability," and in response to a section of the form that asked him to "describe how and where accident occurred," he stated, "Was moving chair could hardly move day after." Id., Vol. II at 303.

As part of his application for short-term disability benefits, Owings also arranged for the submission of statements from his employer and his treating physician. On July 29, 2013, Michael McClintick, Owings' treating physician, completed a form for United entitled "Attending Physician's Statement." Id. at 308. McClintick listed the "Date symptoms first appeared" as "July 1st 2013." Id. McClintick also noted on that same form that Owings "ha[d] been continuously disabled (unable to work) from 7-1-2013." Id. at 309. On July 31, Debbie Bratton, Grene's Director of Human Resources, completed and signed an

6

"Employer's Statement" form for United. Id. at 307. She stated on the form that Owings' disability resulted from a "work related task causing back irritation to [a] previous injury." Id. She stated that Owings' "Last Day at Work" was "07/02/2013." Id.

On July 29, 2013, Owings submitted a written application for long-term disability benefits with United. Id. at 310. On this form, Owings stated that his injury occurred on "July 1st" while "[m]oving surgical chair & cabinet at work." Id. Owings in turn explained that he was experiencing "acute lumbar pain with constant spasms and leg pain." Id. Owings stated that on "July 2nd [he] tried to work," but was unable to work a full day. Id. As part of the application for long-term disability benefits, Bratton completed another written "Employer's Statement." Id. at 316. She again listed Owings' last date worked as "07/02/2013," but also stated that Owings did not work a full day that day. Id. Dr. McClintick likewise completed and signed another "Physician's Statement" that was part of the long-term disability application. Id. at 319. McClintick again identified "7-01-2013" as the date that Owings was first unable to work. Id.

On October 31, 2013, United informed Owings by letter that his claim for long-term disability benefits had been approved. The letter stated, in pertinent part, "Our documentation shows that you became Disabled on July 03, 2013." Id., Vol. IV at 950. The letter also explained "that for the first 36 month(s) of benefits you must be Disabled based upon your inability to perform all material

7

duties of your regular occupation as defined in the policy," and that "[a]fter 36 month(s) of benefits you must be Disabled based upon your inability to perform all material duties of any gainful occupation as defined in the policy." Id. at 949-950 (emphasis added). United informed Owings that it had calculated his "Basic Monthly Earnings" as $4,582.93, based on an annual salary of $54,995.20, which in turn resulted in a monthly disability benefit (without any offsets) of $2,749.76. Id. at 951. United began paying Owings that monthly disability benefit following the expiration of the elimination period in the Policy.

On October 3, 2014, an attorney representing Owings sent a letter to United asking that Owings' date of disability be adjusted to July 1, 2013. Id., Vol. III at 594. The attorney explained in the letter that "[t]he injury giving rise to Mr. Owings' current disability occurred on the morning of July 1, 2013," when "Owings was moving a 300 pound piece of medical equipment." Id. The letter further advised that Owings reported the injury to Grene on that same date, and "never returned to work following July 1, 2013." Id.

In response to that letter, United sent an email to Bratton on October 10, 2014, asking, in pertinent part, for the "last day [Owings] worked" and a copy of "all time sheets" for Owings from June 1, 2013 forward. Id. at 523. Bratton responded by email that same day and stated that Owings' "last day at work was July 1, 2013," and that his employment with Grene ended on October 8, 2013. Id. Bratton also stated that because Owings' position at Grene was "exempt," there

8

were no timesheets available.  Id.

On November 10, 2014, United emailed Bratton again asking for clarification of the last day that Owings worked.  On November 13, 2014, Bratton responded that "July 2, 201[3]," was Owings' last day worked and that the July 1, 2013 date mentioned in her earlier email was incorrect.  Bratton also stated that Grene did not have records indicating what time Owings left work on July 2, 2013, but that she could verify that he received full pay for that day.

On November 28, 2014, United issued a letter denying the request to adjust Owings' disability date and stating that Owings' "Disability date w[ould] remain as July 3, 2013."  Id. at 515.  The letter explained that Owings' employer "verified" that his "last day worked occurred on July 02, 2013," which in turn "translate[d] to a Disability date of July 03, 2013, as this [wa]s the first day [he] w[as] unable to work and experienced a Material Duties or earnings loss."  Id. at 517.  The letter also stated that "the date of Disability cannot coincide with your last day worked as you did not experience a loss until you were unable to return to work on July 03, 2013."  Id.

On January 16, 2015, Owings' attorney sent a letter to United appealing its decision.  The letter stated that "[o]n July 1, 2013, Mr. Owings was moving a large surgical chair when he suffered a disabling aggravation to his pre-existing back condition" and "[a]t that moment . . . was no longer physically able to perform any of the material duties of his regular occupation."  Id., Vol. II at 490.

9

On February 9, 2015, United issued a letter denying Owings' appeal. United stated, in pertinent part, "Based on the information in Mr. Owings' file, his last day worked as a Maintenance Supervisor was on July 2, 2013." Id. at 421. The letter further explained:

> In order to determine disability, we review the medical documentation in the file to determine what functional or cognitive impairments are documented and how they would translate into restrictions and limitations. We review the records to determine the claimants maximum work capacity and whether any noted restrictions would preclude them from performing the material acts of their occupation.

Id. "Based on the information in . . . Owings' file," United concluded, "his last day worked as a Maintenance Supervisor was on July 2, 2013." Id.

II

On March 4, 2015, Owings filed suit against United in Kansas state court. Owings "pray[ed] for judgment . . . ordering [United] to pay long-term disability benefits based upon an annual salary of $83,150.00 in accordance with the terms of the Long-Term Disability Benefits policy." Id. at 375.

United removed the case to federal district court. In doing so, United asserted that the federal district court had original jurisdiction over the matter, pursuant to 28 U.S.C. § 1331, because the issues raised in Owings' complaint were governed by the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. § 1001, et seq.

The parties ultimately filed cross motions for summary judgment and, on

April 27, 2016, the district court issued a memorandum and order granting United's motion for summary judgment and denying Owings' motion for summary judgment. Judgment in the case was entered that same day.

Owings filed a timely notice of appeal.

III

Owings argues on appeal that the district court erred in granting summary judgment in favor of United and in denying his own motion for summary judgment. "We review the district court's grant of summary judgment de novo." Pioneer Centres Holding Co. Emp. Stock Ownership Plan v. Alerus Fin., N.A., 858 F.3d 1324, 1333 (10th Cir. 2017). "Summary judgment is appropriate if 'there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Williams v. FedEx Corp. Serv., 849 F.3d 889, 895 (10th Cir. 2017) (quoting Fed. R. Civ. P. 56(a)). We view the evidence and draw reasonable inferences in the light most favorable to the nonmoving party. Id.

A benefits decision under an ERISA-governed plan is generally reviewed de novo unless the benefit plan affords the administrator or fiduciary with discretionary authority to determine eligibility for benefits or to construe the terms of the plan. Eugene S. v. Horizon Blue Cross Blue Shield of New Jersey, 663 F.3d 1124, 1130 (10th Cir. 2011). In this case, the Policy expressly afforded United with "the discretion and final authority to construe and interpret the Policy." Aplt. App., Vol. II at 355. Thus, we apply a deferential standard of

11

review, "asking only whether the" benefits decision at issue "was arbitrary and capricious." Id. (internal quotation marks omitted). "Under this arbitrary-and-capricious standard, our review is limited to determining whether the interpretation of the plan was reasonable and made in good faith."[2] Id. (internal quotation marks omitted).

*United's interpretation of the Policy term "Disability"*

Owings begins by arguing that United, in calculating the amount of his monthly long-term disability benefit under the Policy, "abused its discretion in how it interpreted the term 'Disability.'" Aplt. Br. at 16. Owings asserts that although "[t]he Policy defines disability by reference to the inability to perform 'at least one of the Material Duties' of the insured's Regular Occupation," id. (quoting Aplt. App., Vol. I at 53)), United "conducted its review by focusing on whether 'any noted restrictions would preclude [Owings] from performing **the material acts** of [his] occupation.'" Id. (quoting Aplt. App., Vol. II at 421) (emphasis added in Owings' brief). In other words, Owings asserts, "United has omitted reference to the phrase 'at least one of' that modified the phrase 'the material acts' in the [Policy's] definition of disability." Id. "This omission,"

---

[2] Because United acted in a dual role, i.e., both evaluating and paying claims, it was operating under a conflict of interest. See Foster v. PPG Indus., Inc., 693 F.3d 1226, 1232 (10th Cir. 2012). Typically, we would weigh this conflict of interest as a factor in our analysis, id., but we need not do so in this case because, even setting the conflict of interest aside, it is clear from the record that United acted arbitrarily and capriciously in interpreting the Policy language.

12

Owings argues, "appears deliberately designed to create confusion, as the inability to perform 'the material acts' of the job could conceivably be read to mean an inability to do each and every job duty." Id. And indeed, Owings notes, "United argued to the District Court that [his] disability did not start until July 3rd because" he "'admit[ted] performing at least one job duty on July 2.'" Id. at 16-17 (quoting Aplt. App., Vol. I at 93) (emphasis added in Owings' brief).

As previously noted, the Policy defines the terms "Disability" and "Disabled" in the following manner:

> *Disability* and *Disabled* mean that because of an Injury or Sickness, a significant change in Your mental or physical functional capacity has occurred, as a result of which:
>
> > a) during the Elimination Period, You are prevented from performing at least one of the Material Duties of Your Regular Occupation on a part-time or full-time basis; and
> >
> > b) after the Elimination Period, You are:
> >
> > > 1. prevented from performing at least one of the Material Duties of Your Regular Occupation on a part-time or full-time basis; and
> > > 2. unable to generate Current Earnings which exceed 99% of Your Basic Monthly Earnings due to that same Injury or Sickness.
>
> After a Monthly Benefit has been paid for 3 years, *Disability* and *Disabled* mean You are unable to perform all of the Material Duties of any Gainful Occupation.

Aplt. App., Vol. II at 359.

Both during and after the Elimination Period (until the point at which a

monthly disability benefit has been paid for three years), this definition effectively imposes three requirements. First, a "significant change" in the employee's "mental or physical functional capacity" must have occurred "because of an Injury or Sickness." Id. Second, both during and after the Elimination Period, this must have "prevented" the employee "from performing at least one of the Material Duties of [his or her] Regular Occupation on a part-time or full-time basis." Id. The Policy defines "Material Duties" to "mean[] the essential tasks, functions, and operations relating to an occupation that cannot be reasonably omitted or modified," and includes "the ability to work for an employer on a full-time basis." Id. at 360. Third, after the Elimination Period the employee must be "unable to generate Current Earnings which exceed 99% of [his or her] Basic Monthly Earnings due to that same Injury or Sickness." Id. at 359.

Owings argues, and we agree, that United, in processing his claim for long-term disability benefits, repeatedly misconstrued the second of these requirements. When it first approved Owings' claim for long-term disability benefits on October 31, 2013, United construed the term "Disability" as requiring him to be unable "to perform all material duties of [his] regular occupation." ROA, Vol. IV at 949. Later, when United denied Owings' administrative appeal, it continued to focus on "whether any noted restrictions would preclude [Owings] from performing the material acts of [his] occupation." Id., Vol. II at 421 (emphasis added). And finally, in the district court proceedings, United

14

effectively adopted the same interpretation, arguing that Owings' "disability did not begin until July 3" because "Owings admit[ted] performing at least one job duty on July 2." Id., Vol. I at 93. Without question, these interpretations are inconsistent with the plain language of the Policy, which requires only that the injury or sickness prevent the employee from being able to perform one material duty of his or her regular occupation, and are thus arbitrary and capricious.[3]

*Owings' date of "Disability"*

United also, in the course of processing Owings' claim for long-term disability benefits and his administrative appeal of United's original decision, interpreted the Policy as effectively prohibiting an employee from being declared "Disabled" on the last day that he or she worked. According to United, "[t]he Policy's definition of 'Disability' specifically requires the prevention of performing at least one of the job duties on a part-time or full-time basis." Aplee.

---

[3] Owings argues, relatedly, that United also "abused its discretion by deciding that the receipt of sick pay, PTO, or other compensation is proper proof of non-Disability." Aplt. Br. at 18. There is no indication in the record, however, that United relied on the receipt of pay as so-called "proof of non-Disability." In its letter initially approving Owings' request for long-term disability benefits, United said nothing about Owings' receipt of pay. Later, in its letter denying Owings' request to adjust his disability date, United focused primarily on what it considered to be Owings' last day worked at Grene. Of course, United's letter referred to "July 03, 2013" as being "the first day you were unable to work and experienced a Material Duties or earnings loss." Aplt. App., Vol. III at 517 (emphasis added). But the reference to "earnings loss" appears to have been immaterial to United's decision. Lastly, in denying Owings' administrative appeal, United again focused on "Owings' last day worked," and otherwise made no reference to his receipt of pay on July 1 or 2, 2013. Id., Vol. II at 421.

Br. at 19.  United in turn asserts "that Owings performed his job with no impairment for at least part of the day – *i.e.*, on a part-time basis – on July 1."  Id. at 20.  Thus, United asserts, it "reasonably interpreted the Policy to hold that Owings' Disability began, at the earliest, on July 2."  Id.

We reject United's interpretation as not reasonably supported by the language of the Policy.  In particular, the notion that the date of "Disability" cannot be the same as the employee's last day worked appears nowhere in the Policy and cannot reasonably be inferred from the Policy's definition of "Disability" or its other provisions.  To be sure, the Policy's definition of "Disability" incorporates the phrase "part-time or full-time basis."  But that phrase does nothing to alter the Policy's simple requirement that, to be disabled, an employee must be unable to perform at least one material duty of his or her occupation.  Nor does that phrase support United's conclusion that an employee cannot become immediately "disabled" after working for part of a day.  Indeed, as was the case with Owings, it would not be unusual for a disabling injury to occur on the job and to immediately prevent the employee, from that moment forward, from being able to "perform[] at least one of the Material Duties of [his or her] Regular Occupation on a part-time or full-time basis."  For United to declare that, under such circumstances, the date of "Disability" does not occur until at least the day after the injury is unreasonable in light of the plain Policy language.

16

*Did United err in relying exclusively on the statements from Bratton?*

Owings asserts, relatedly, that United erred in "blindly rely[ing] on the statements of" Bratton, Grene's human resource director. Aplt. Br. at 20. We agree. Without question, the record establishes that United rejected Owings' initial request to adjust his disability date, as well as his subsequent administrative appeal, primarily, if not exclusively, on the basis of Bratton's statements regarding Owings' last day worked at Grene, which she indicated was July 2, 2013. This error on United's part was tied to its misinterpretation of the Policy's definition of "Disability." Specifically, the record indicates that United's investigation focused solely on determining whether Owings "worked" on a particular day, rather than determining when the injury he sustained on July 1, 2013, prevented him from performing one or more material duties of his position.

*Owings' entitlement to summary judgment*

As a final matter, Owings argues that "[h]ad United applied the actual Policy language, . . . it would have arrived at the correct conclusion that [he] became disabled on July 1st when he suffered an incapacitating back injury." Id. Once again, we agree. It is undisputed that Owings' injury occurred partway through his work day on July 1, 2013, and that Owings informed Bratton of his injury during a meeting later that same day. Further, the records from Owings' treating physician identify July 1, 2013, as the date that Owings was first unable

17

to work.[4]  Lastly, as Owings notes, "[t]he only evidence" in the record "about [his] physical condition is that he was unable to move on July 2, 2013; that he did not go to work on July 2, 2013; and the only thing he did on July 2, 2013 in terms of 'work' consisted of using the company cell phone."  Id.

For all of these reasons, we conclude that United acted arbitrarily and capriciously in interpreting and applying the Policy language—in particular the definition of "Disability"—to Owings' case.  Under the plain and ordinary meaning of the Policy language, it is clear, based upon the undisputed record before us, that Owings became disabled on July 1, 2013, when he sustained a back injury while at work and was thereafter unable to perform one or more of the material duties of his regular occupation.  Consequently, we conclude that the proper remedy is to reverse the district court's grant of summary judgment in favor of United and remand with directions to enter summary judgment in favor of Owings.

IV

The judgment of the district court is REVERSED and the matter is REMANDED with directions to enter summary judgment in favor of Owings.

_____

[4] The record is silent with respect to Owings' precise physical condition on July 1, 2013, after he sustained his injury.  But, notably, United made no attempt to delve into this issue during the course of considering and ultimately denying Owings' administrative appeal.  Instead, United effectively conceded that Owings' injury rendered him physically unable to fulfill the material duties of his job.

Owings' request for leave to file under seal the medical records listed in his response to the court's September 6, 2017 show cause order is GRANTED.