**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**AUG 30 2000**

**PATRICK FISHER**
**Clerk**

PUBLISH

UNITED STATES COURT OF APPEALS

TENTH CIRCUIT

---

GERALD M. THOMAS,

      Plaintiff-Appellant,

v.

NATIONAL ASSOCIATION OF
LETTER CARRIERS; MARVIN T.
RUNYON, Postmaster General, United
States Postal Service,

      Defendants-Appellees.

Nos. 99-3044, 99-3045

---

**Appeal from the United States District Court**
**for the District of Kansas**
**(D.C. No. 98-CV-1314-WEB)**

---

Donald N. Peterson, II (Marc A. Powell with him on the brief), of Powell,
Brewer, Gough & Withers, L.L.P., Wichita, Kansas, for Plaintiff-Appellant.

Peter Herman (Peter D. DeChiara with him on the brief), of Cohen, Weiss, and
Simon, New York, New York, for Defendant-Appellee National Association of
Letter Carriers.

David G. Karro (R. Andrew German with him on the brief), of the United States
Postal Service, Washington, D.C., for Defendant-Appellee Marvin T. Runyon.

---

Before **EBEL** and **HENRY,** Circuit Judges**,** and **WEINSHIENK**,[*] District Judge.

_____

**EBEL**, Circuit Judge.

_____

Before us are two appeals by Gerald M. Thomas ("Thomas"). The first is an appeal of the district court's order granting summary judgment to the United States Postal Service ("Postal Service") on Thomas's religious discrimination claim, and the second is an appeal of the district court's order granting a motion by the National Association of Letter Carriers ("NALC") to dismiss Thomas's state wrongful discharge and civil conspiracy claims. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm.

_____

[*]The Honorable Zita L. Weinshienk, Senior District Judge for the United States District Court for the District of Colorado, sitting by designation.

# I. BACKGROUND[1]

Thomas was employed by the Postal Service from February 28, 1987 to May 31, 1996. From February 1987 to November 1988, Thomas worked in a part-time flex position; from November 1988 to December 1990, Thomas worked as a regular mail carrier at the Wassall post office in Wichita, Kansas; and from December 1990 until his termination on May 31, 1996, Thomas worked a bid route at the Corporate Hills Station in Wichita.

The National Collective Bargaining Agreement (CBA) between the Postal Service and the NALC requires the Local Union to regulate employees' days off pursuant to the Local Memorandum of Understanding (LMOU). By virtue of the LMOU, Thomas, along with the other 400-plus regular residential letter carriers, was placed on a rotating schedule that required him to work five Saturdays out of six. The rotating schedule was determined by a vote of the letter carriers, and Postal Service management had no authority to change the work schedule without

---

[1]In reviewing the appeal from the grant of summary judgment against Thomas, we accept the version of the facts most favorable to Thomas, the non-moving party. See Mann v. United States, 204 F.3d 1012, 1016 (10th Cir. 2000). In reviewing the motion to dismiss, we accept the allegations in the complaint. See Utah v. Babbitt, 137 F.3d 1193, 1204 (10th Cir. 1998). To the extent that the district court made factual findings and the parties fail to submit an adequate factual record on appeal to enable us to review those findings, we accept those findings as correct. See Naimie v. Cytozyme Lab., Inc., 174 F.3d 1104, 1113 (10th Cir. 1999).

union approval because doing so would violate the contractual commitment in the LMOU.

Toward the end of 1993, Thomas became a member of the Church of God. One of the central tenets of the Church of God is strict observance of the Sabbath, which, for that religion, falls on Saturdays. In January 1994, Thomas informed station manager Mark Kerschen of his religious beliefs and asked if something could be done to allow him to receive all Saturdays off from work. Thomas also brought the matter up with Roy Martin, the postmaster, and Tom Brasser, the labor relations specialist at the Postal Service. In addition, Thomas spoke with Union stewards David Willits and Larry Gunkel about the matter.

In response to Thomas's request, the Postal Service approved twenty-five of Thomas's twenty-nine requests to take annual leave on Saturdays in 1994. In 1995, the Postal Service approved twenty of Thomas's twenty-two requests to take annual leave on Saturdays. Postal Service management also allowed Thomas to trade with other letter carriers who voluntarily agreed to work for him on Saturdays. The Postal Service suggested to Thomas that he change crafts and bid on a position that would not require him to work on Saturdays, as another letter carrier who had requested accommodation due to similar religious beliefs had

- 4 -

done.[2]  The Postal Service, however, also told Thomas that because of the seniority system which gives the most senior employees first choice for job assignments, Thomas's lack of seniority would likely prevent him from successfully bidding for such a position.  Thomas never bid for a position that would not require him to work on Saturdays.  Roy Martin and Tom Brasser approached Gunkel, the President of the Local Union, to ask the Union to issue a waiver excusing Thomas from the LMOU-established Saturday work schedule.  The Local Union refused to grant such a waiver.

Thomas suggested the following accommodation alternatives to enable him to observe his religious beliefs: (1) maintain his route as a letter carrier and receive Saturdays and Sundays off from work; (2) maintain his route as a letter carrier and have a substitute carry his route on Saturdays; (3) maintain his route as a letter carrier and have a part-time flexible or unassigned regular employee carry his route on Saturdays; (4) maintain his route as a letter carrier with all Saturdays off from work and be available to work on Sunday; and (5) maintain his route as a letter carrier, but only work four days a week.

---

[2]The other letter carrier who had requested accommodation was Mark Metz. The Union refused to allow management to assign Metz, as a letter carrier, to Saturday as a permanent day off from work.  Metz transferred to the maintenance craft so he would not have to work on Saturdays.

The Local Union would not agree to any of Thomas's suggested accommodations on the theory that each would have permanently excused Thomas from working on Saturdays, thus each violated the LMOU. The Postal Service could not alter the LMOU on its own. Gunkel informed Thomas directly that it was not possible to grant him an exemption from the rotating schedule established by the LMOU so that he would not have to work on Saturdays.

Thomas refused to work on Saturdays, and was absent without leave several times when he was unable to use his leave. As a result, he received the following progressive discipline: (1) a seven-day suspension on 11/2/94 that was subsequently reduced to a letter of warning; (2) a fourteen-day suspension on 11/23/94 that was subsequently reduced to a seven-day suspension; (3) a fourteen-day suspension on 12/6/94; (4) a Notice of Removal on 1/9/95 that was held in abeyance provided Thomas was not absent without leave again; (5) a Notice of Removal on 6/16/95 which resulted in Thomas being removed; however his work assignment was held pending further grievance/arbitration procedures, which ultimately resulted in a pre-arbitration settlement on 1/5/96 that allowed Thomas to return to work with the understanding that he would work his bid assignment as

posted; and (6) removal from the Postal Service on 4/26/96 after Thomas was absent without leave again.[3]

Thomas filed suit against Marvin Runyon, the Postmaster General of the Postal Service, in federal district court in July, 1997, alleging that he was unlawfully discharged because of his religious beliefs. Approximately one year later, Thomas also filed suit against the Postal Service and the NALC in Kansas state court, alleging wrongful discharge and civil conspiracy in violation of state law.[4] The latter case was subsequently removed to federal court.

The district court granted the Postal Service's motion for summary judgment on the religious discrimination claim on January 5, 1999. Thomas v. Runyon, 36 F. Supp.2d 1284, 1289 (D. Kan. 1999). Thomas now appeals that ruling. In a separate opinion issued the same day, the district court granted the Postal Service and NALC's motions to dismiss the wrongful discharge and civil

---

[3]On December 13, 1994, Thomas filed a complaint with the EEOC, alleging religious discrimination by the Postal Service. On April 8, 1997, the EEOC's Administrative Judge recommended granting summary judgment to Thomas after finding that religious discrimination had been committed by the Postal Service. The EEOC specifically found that the Postal Service had failed to establish that it attempted reasonably to accommodate Thomas's religious belief, or that doing so would cause an undue hardship. On June 9, 1997, the Postal Service issued a Final Agency Decision rejecting the Administrative Judge's findings and conclusions.

[4] Prior to filing this suit in state court, Thomas had moved for leave to amend his religious discrimination complaint to add the NALC as a defendant and to assert a claim against NALC for breach of the duty of fair representation. That motion was denied because it was untimely.

conspiracy claims pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure. Thomas v. National Ass'n of Letter Carriers, 40 F. Supp.2d 1244, 1249 (D. Kan. 1999). The court granted the Postal Service's motion to dismiss on the ground that Title VII preempted Thomas's state law claims against the Postal Service. In granting NALC's motion to dismiss, the court found that Thomas's claims against NALC constituted a claim for breach of the duty of fair representation, which was preempted by federal labor law and barred by the applicable six-month statute of limitations. The district court further held that even if the claims were not preempted, the motion to dismiss should still be granted because the complaint failed to state a claim upon which relief could be granted. Thomas does not appeal the district court's order granting the Postal Service's motion to dismiss, but he does appeal the order granting NALC's motion to dismiss.

## II. DISCUSSION

A. Religious Discrimination Claim

We review the district court's grant of summary judgment de novo, applying the same legal standard used by the district court. Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). When applying this standard, we view the evidence and draw reasonable inferences therefrom in the

light most favorable to the nonmoving party. If there is no genuine issue of material fact in dispute, we determine whether the district court correctly applied the substantive law.

Green v. Barrett, 174 F.3d 1136, 1139 (10th Cir. 1999) (internal citations omitted).

Title VII makes it "an unlawful employment practice for an employer . . . to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion." 42 U.S.C. § 2000e-2(a)(1). "Religion" is defined to include only those "aspects of religious observance and practice" that an employer is able to "reasonably accommodate . . . without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j). Title VII imposes an obligation on the employer "to reasonably accommodate the religious practices of an employee or prospective employee, unless the employer demonstrates that accommodation would result in undue hardship on the conduct of its business." 29 C.F.R. § 1605.2(b)(1), (2) (1999) (citing TWA v. Hardison, 432 U.S. 63, 74, 97 S.Ct. 2264, 2271-72, 53 L.Ed.2d 113 (1977)).

This statutory and regulatory framework, like the statutory and regulatory framework of the Americans with Disabilities Act (ADA), involves an interactive process that requires participation by both the employer and the employee. See Ansonia Bd. of Educ. v. Philbrook, 479 U.S. 60, 69 107 S.Ct. 367, 372, 93

L.Ed.2d 305 (stating that, consistent with the goals expressed in the legislative history of the religious accommodation provision, "courts have noted that bilateral cooperation is appropriate in the search for an acceptable reconciliation of the needs of the employee's religion and the exigencies of the employer's business") (internal quotations and citations omitted); Smith v. Pyro Mining Co., 827 F.2d 1081, 1085 (6th Cir. 1987) ("Although the burden is on the employer to accommodate the employee's religious needs, the employee must make some effort to cooperate with an employer's attempt at accommodation."); cf. Smith v. Midland Brake, Inc., 180 F.3d 1154, 1171-72 (10th Cir. 1999) (en banc) (discussing the interactive process between an employer and an employee under the ADA).[5]

In the summary judgment context, we apply the principles outlined above through the familiar burden shifting approach set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). See Smith,

---

[5]A claim of religious discrimination under Title VII is similar to a claim under the ADA because, in both situations, the employer has an affirmative obligation to make a reasonable accommodation. Compare 42 U.S.C. § 2000e(j), and 29 C.F.R. § 1605.2(b)(2), with 42 U.S.C. § 12112(b)(5)(A), and 29 C.F.R. § August 10, 20001630.9. We stated in Smith that "[t]he obligation to engage in an interactive process is inherent in the statutory obligation to offer a reasonable accommodation to an otherwise qualified disabled employee." Smith, 180 F.3d at 1172. The "interactive process" rationale is equally applicable to the obligation to offer a reasonable accommodation to an individual whose religious beliefs conflict with an employment requirement.

180 F.3d at 1178-79.[6]  To survive summary judgment on a religious

discrimination claim of failure to accommodate, the employee initially bears the

burden of production with respect to a prima facie case.  The employee must show

that (1) he or she had a bona fide religious belief that conflicts with an

employment requirement; (2) he or she informed his employer of this belief; and

(3) he or she was fired for failure to comply with the conflicting employment

requirement.  See Toledo v. Nobel-Sysco, Inc., 892 F.2d 1481, 1486 (10th Cir.

1989) (citation omitted).  Here, there is no dispute that Thomas established a

prima facie case.

The burden then shifts to the employer to (1) conclusively rebut one or

more elements of the plaintiff's prima facie case, (2) show that it offered a

---

[6]In Smith, we explained how the purpose of the burden-shifting mechanism
differs in an ADA failure to accommodate case.  That explanation also applies to
a religious discrimination failure to accommodate case:

> The purpose of a burden shifting approach is a bit different in an
> ADA Failure to Accommodate case.  In such a case, the Congress has
> already determined that a failure to offer a reasonable
> accommodation to an otherwise qualified disabled employee *is*
> unlawful discrimination.  Thus, we use the burden-shifting
> mechanism, not to probe the subjective intent of the employer, but
> rather simply to provide a useful structure by which the district court,
> when considering a motion for summary judgment, can determine
> whether the various parties have advanced sufficient evidence to
> meet their respective traditional burdens to prove or disprove the
> reasonableness of the accommodations offered or not offered.

Smith, 180 F.3d at 1178 n.12 (citation omitted).

reasonable accommodation,[7] or (3) show that it was unable reasonably to accommodate the employee's religious needs without undue hardship.  See id.

The Postal Service took the following steps to try to accommodate Thomas' religious beliefs: it approved Thomas' use of leave on Saturdays, it approved the use of substitutes for him on Saturdays when such substitutes could be found; it sought a waiver from the union of the requirement that all letter carriers work five out of six Saturdays; and it recommended that Thomas bid for a position that would not require him to work on Saturdays, even though it also told him he was unlikely to succeed in getting such a position because of the governing seniority agreement and Thomas's lack of seniority.

Against this backdrop, we consider the five accommodation requests made by Thomas.  The district court found that all five of Thomas's requests would have violated the LMOU.  See Thomas, 36 F. Supp.2d at 1287-88.  Thomas has not argued that this finding was incorrect.  Moreover, Thomas has not included a copy of the LMOU in the record on this appeal, so we have no basis for concluding that the district court's finding was in error.  Thus, we accept the district court's finding that all five of Thomas's suggested accommodations would

_____

[7]"By its very terms the statute directs that any reasonable accommodation by the employer is sufficient to meet its accommodation obligation." Ansonia, 479 U.S. at 68.  The employer does not have to demonstrate that the particular accommodation requested by the employee would result in an undue hardship. Id. at 68-69.

have violated the LMOU. See Naimie, 174 F.3d at 1113 ("[W]here appellant fails to submit sufficient portions of the record, an appellate court cannot review the district court's factual findings and must accept them as correct.") (quotations and citations omitted). Under Hardison, the duty to accommodate Thomas's beliefs does not require the Postal Service to violate the LMOU. See Hardison, 432 U.S. at 79 ("[W]e do not believe that the duty to accommodate requires [the company] to take steps inconsistent with the otherwise valid [collective bargaining] agreement."); Lee v. ABF Freight Sys., Inc., 22 F.3d 1019, 1023 (10th Cir. 1994) ("Nor does Title VII require an employer to violate a valid labor agreement to accommodate an employee."). Requiring such a violation through any of Thomas's suggested accommodations would result in an undue hardship on the conduct of the employer's business.

Thomas argues that the Postal Service should have provided more active assistance in helping him locate a "voluntary permanent swap" for Saturdays, and that such assistance would not have violated the LMOU. However, the district court found that this accommodation also would have violated the LMOU, see Thomas, 36 F. Supp.2d at 1288, and again, without the LMOU in front of us on appeal, we accept this finding as correct. In addition, the record does not indicate that Thomas ever made such a request at the time that the reasonable accommodation was being sought. Although an employer has a duty reasonably

to accommodate an employee's religious beliefs or to show that reasonable accommodation cannot be made without undue hardship, this duty does not obligate the employer to consider and preclude an infinite number of possible accommodations. In the interactive process between employer and employee, the employer here considered every accommodation requested by Thomas and rightfully rejected each as unduly burdensome. In addition, it remained sympathetic to Thomas's religious requirements, approved all voluntary schedule swaps that Thomas was able to arrange, and imposed no restrictions or impediments on Thomas's ability to attempt to arrange further voluntary schedule swaps with other employees. This is all that Title VII reasonably requires the Postal Service to do. 29 C.F.R. § 1605.2(d)(1)(i).

We have, in a closely analogous case, held that actions similar to those of the Postal Service here constitute all that is reasonably required of an employer to accommodate the employee's religion. In <u>United States v. Albuquerque</u>, 545 F.2d 110 (10th Cir. 1976), we held that an employer had done all that was reasonably required under 42 U.S.C. § 2000e-2 once it had encouraged the employee to try to find another employee to swap shifts with him so that he could avoid working on Saturdays in violation of his religious beliefs. We held that it would have been unreasonable to require the employer to go further and attempt to arrange a schedule swap for the plaintiff. We recognized the interactive and reciprocal

- 14 -

duties inherent in a reasonableness analysis, and concluded that the employer had done all that was reasonably required of it when it was amenable to, and receptive to, efforts that the employee could have conducted for himself to arrange his own schedule swap. We believe the holding of that case is controlling here. See also Pyro Mining Co., 827 F.2d at 1088 (holding that so long as the plaintiff had no religious constraints against arranging his own schedule swap with other employees, it would be a sufficient reasonable accommodation for the employer simply to be amenable to such a swap without requiring the employer itself actively to solicit other employees to make such a swap); Lee, 22 F.3d at 1022-23 ("The defendant's efforts to reach a reasonable accommodation triggered [the plaintiff's] duty to cooperate."); Brener v. Diagnostic Ctr. Hosp., 671 F.2d 141, 144-46 (5th Cir. 1982).[8]

Finally, at no time did Thomas ever prove that further voluntary swaps were possible or even likely. As such, he failed to prove that further efforts by

_____

[8]We note that each case has to be looked at on its own facts, and that we are not attempting to impose a universal rule. Other factors, not present in this case, could require an employer to take a more active role in securing a voluntary swap for the employee. Pyro Mining suggests one factor -- the plaintiff-employee's religious constraints against asking others to work in his place on Sunday; and we do not preclude the possibility of other factors, nonburdensome to the employer, which might require an employer's active participation in the process. However, no such factors are raised here.

the Postal Service to arrange voluntary schedule swaps were even a possible

reasonable accommodation.  See Smith, 180 F.3d at 1174.

We conclude that the employer has met its burden under Title VII, and that

Thomas has not shown that there is a genuine issue remaining for trial.  Summary

judgment on Thomas's religious discrimination claim was appropriate.[9]


B.  State Law Claims Against NALC for Wrongful Discharge and Civil Conspiracy

We review de novo the district court's order granting a motion to dismiss

under Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.  See

Ordinance 59 Ass'n v. United States Dep't of the Interior Secretary, 163 F.3d

1150, 1152 (10th Cir. 1998).  "Accepting the complaint's allegations as true, we

consider whether the complaint, standing alone, is legally sufficient to state a

---

[9]Thomas also argues that he is entitled to a trial on a separate claim of intentional religious discrimination.  Thomas's single-count complaint, however, does not clearly indicate that he raised an intentional religious discrimination claim distinct from his claim that the Postal Service failed reasonably to accommodate his religious beliefs.  See Thomas, 36 F. Supp.2d at 1287 n.1.  In any event, on summary judgment Thomas offered no evidence that the Postal Service acted out of a discriminatory motive against his religion, nor did Thomas offer any evidence that the Postal Service's reason for discharging him because of his unauthorized absences was pretextual.  Accordingly, Thomas does not show that there was error in granting summary judgment against him on an intentional discrimination claim if such a claim were alleged.

claim upon which relief may be granted." Id. (internal quotations and citations omitted).

We agree with the district court that Thomas's claims against NALC constituted a claim for breach of the duty of fair representation, which was preempted by federal labor law and barred by the applicable six-month statute of limitations.

Where a plaintiff's allegations fall within the scope of the duty of fair representation, federal labor law governs and ordinarily preempts any state-law claims based on those allegations. See VACA v. Sipes, 386 U.S. 171, 177, 87 S.Ct. 903, 910, 17 L.Ed.2d 842 (1967); BIW Deceived v. Local S6, Indus. Union of Marine and Shipbuilding Workers, 132 F.3d 824, 830 (1st Cir. 1997); Richardson v. United Steelworkers, 864 F.2d 1162, 1170 (5th Cir. 1989). Although Thomas framed his state law claims under state wrongful discharge and civil conspiracy theories, those claims against NALC actually amount to a claim for breach of the duty of fair representation. Thomas's wrongful discharge and civil conspiracy claims against NALC are premised on the notion that NALC wrongfully agreed with the Postal Service to discharge Thomas because of his religious beliefs, and that the discharge was in violation of Kansas public policy protecting the free exercise of religion. Under federal labor law, a union has a duty to represent fairly all employees for whom it serves as a bargaining agent,

- 17 -

and it may be liable for breach of the duty of fair representation when its conduct "toward a member of the collective bargaining unit is arbitrary, discriminatory, or in bad faith." VACA, 386 U.S. at 190. The duty of fair representation requires NALC "to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." Id. at 177. We agree with the district court that this duty "would certainly encompass the alleged actions of the Union of 'act[ing] in concert [with the Postal Service] to discriminate against plaintiff due to his religious belief in observing the Sabbath' and 'agree[ing] that plaintiff should be discharged.'" Thomas v. National Ass'n of Letter Carriers, 40 F. Supp.2d 1244, 1247 (quoting Thomas's Petition at ¶¶ 7 & 8).

Thomas argues that even if his claims amount to a breach of the duty of fair representation, they fall within the exception to preemption recognized in Farmer v. United Brotherhood of Carpenters, 430 U.S. 290, 296-97, 97 S.Ct. 1056, 1061, 51 L.Ed.2d 338 (1977), for overriding state interests "deeply rooted in local feeling and responsibility." The exception to preemption set forth in Farmer, however, requires, in addition to such a strong state interest, a showing that (1) the state tort is "unrelated to" the federal law, or (2) the state tort is "a function of the particularly abusive manner" in which the discrimination is accomplished

- 18 -

rather than a function of the actual discrimination itself.  <u>Farmer</u>, 430 U.S. at 305.

Thomas has not met either of these requirements.

Therefore, because Thomas's wrongful discharge and civil conspiracy claims amount to a claim for a breach of the duty of fair representation and a <u>Farmer</u> exception to preemption does not apply, Thomas's claims are preempted by federal labor law.  Because Thomas did not bring a federal claim within the applicable six-month statute of limitations for claims asserting a violation of the duty of fair representation, such a federal claim is now barred as untimely.  <u>See</u> <u>DelCostello v. International Bhd. of Teamsters</u>, 462 U.S. 151, 169-70, 103 S.Ct. 2281, 2293-94, 76 L.Ed.2d 476 (1983) (holding that six-month statute of limitations period for filing unfair labor practice charges applies to employee's action for breach of the duty of fair representation); <u>Arnold v. Air Midwest, Inc.</u>, 100 F.3d 857, 859 (10th Cir. 1996) (noting that six-month statute of limitations applies to a duty of fair representation claim).  The district court correctly granted the motion to dismiss.[10]

_____

[10]We also note that even if Thomas's state law claims against NALC were not preempted, the motion to dismiss was correctly granted.  Because Title VII provides an adequate remedy for religious discrimination in employment, Thomas could not assert a claim for wrongful discharge in violation of Kansas public policy on religious discrimination grounds.  <u>See</u> <u>Conner v. Schnuck Markets, Inc.</u>, 121 F.3d 1390, 1399 (10th Cir. 1997). Further, Thomas did not allege one or more unlawful overt acts as required by Kansas law for a civil conspiracy claim in order to make NALC liable for any wrongful discharge by the Postal Service.  <u>See</u>
(continued...)

## III. CONCLUSION

For the foregoing reasons, we AFFIRM the district court's orders granting the Postal Service's motion for summary judgment and NALC's motion to dismiss.

---

[10](...continued)
Vetter v. Morgan, 913 P.2d 1200, 1205-06 (Kan. Ct. App. 1995) (discussing elements of civil conspiracy claim).