**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**January 17, 2018**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

RICHARD TABURA; GUADALUPE
DIAZ,

     Plaintiffs - Appellants,

v.

     No. 16-4135

KELLOGG USA,

     Defendant - Appellee.

------------------------------

EQUAL EMPLOYMENT
OPPORTUNITY COMMISSION,

     Amicus Curiae.

_____

**Appeal from the United States District Court**
**for the District of Utah**
**(D.C. No. 1:14-CV-00014-TC-PMW)**
_____

Gene C. Schaerr, Schaerr Duncan LLP, Washington, D. C. (Stuart Kyle Duncan and
Michael T. Worley, Schaerr Duncan LLP, Washington, D. C.; Alan Jay Reinach, Church
State Council, Westlake Village, California; Erik Strindberg and Matt Harrison,
Strindberg & Scholnick LLP, Salt Lake City, Utah; and Todd R. McFarland, General
Conference of Seventh Day Adventists, Silver Spring, Maryland, with him on the briefs),
for Plaintiffs-Appellants.

Timothy P. Monsma, Varnum LLP, Grand Rapids, Michigan (Lawrence J. Murphy,
Varnum LLP, Grand Rapids, Michigan; Matthew M. Durham and Lauren A. Shurman,
Stoel Rives LLP, Salt Lake City, Utah, with him on the briefs), for Defendant-Appellee.

Gail S. Coleman (P. David Lopez, Jennifer S. Goldstein, and Margo Pave, with her on the brief), Equal Employment Opportunity Commission, Washington, District of Columbia, for Amicus Curiae.

_____

Before **KELLY**, **EBEL**, and **BACHARACH**, Circuit Judges.

_____

**EBEL**, Circuit Judge.

_____

Plaintiffs Richard Tabura and Guadalupe Diaz ("Plaintiffs") are Seventh Day Adventists who honor the Sabbath by refraining from work each week from Friday at sundown through sundown Saturday. That religious practice conflicted with their job schedules at a food production plant operated by Defendant Kellogg USA, Inc. ("Kellogg"). Eventually Kellogg terminated each Plaintiff for not working their Saturday shifts. Plaintiffs allege that in doing so, Kellogg violated Title VII of the Civil Rights Act by failing to accommodate their Sabbath observance. Both sides moved for summary judgment. The district court denied Plaintiffs' motion and granted Kellogg summary judgment, concluding as a matter of law both that Kellogg did reasonably accommodate Plaintiffs' religious practice and, alternatively, that Kellogg could not further accommodate their Sabbath observance without incurring undue hardship. We conclude, on the record before us, that the district court erred in granting Kellogg summary judgment; however, on that same record, the district court did not err in denying Plaintiffs summary judgment. Having jurisdiction under 28 U.S.C. § 1291, therefore, we REVERSE summary judgment for Kellogg and REMAND for further proceedings.

2

# I. BACKGROUND

When Plaintiffs began working at the food production plant in Clearfield, Utah, they worked Monday through Thursday, ten hours a day. Plaintiffs continued with that schedule after Kellogg took over the plant in 2007. In March 2011, however, Kellogg changed its shift schedule, adopting "continuous crewing" by dividing the plant's workforce into four shifts, designated A, B, C, and D. Each shift worked twelve hours a day for two or three days, and then would have two or three days off. Tabura and Diaz worked on Shift A, a day shift that included approximately twenty-five to thirty employees who worked from 6 a.m. to 6 or 6:30 p.m. Tabura was among the twelve to fifteen employees on Shift A who worked in processing; Diaz and the others worked in packaging. Shift A was paired with Shift C, whose members worked at night, from 6 or 6:30 p.m. to 6 or 6:30 a.m. B and D Shifts were similarly paired, one working days and the other nights when Shifts A and C were off.

Each of the four shifts had to work every other Saturday, or twenty-six Saturdays each year. Plaintiffs informed Kellogg that they could not work on Saturdays because it was their Sabbath. During the winter months, Plaintiffs had a further conflict finishing their shifts on Fridays when the sun set before their shift ended. Kellogg permitted Plaintiffs to avoid these scheduling conflicts by using paid vacation and sick/personal time and arranging to swap shifts with other employees. These options were available to any employee who wanted to take a day off for any reason.

3

Although Plaintiffs could swap shifts with other workers, there were difficulties in doing so. Plaintiffs had to arrange their own swaps, the swapping employees had to be qualified to perform each other's jobs, and Kellogg had to approve the swap. Swapping was further complicated because, for safety reasons, Kellogg would not permit an employee to work more than thirteen straight hours, so Plaintiffs could not swap with anyone on C Shift, the night shift that followed Plaintiffs' Shift A. Instead, Plaintiffs had to find someone from either Shift B or D. But Plaintiffs were not at the plant at the same time as those shifts, and the D night shift members would have had to alter their sleep schedules in order to work the A day shift.

Kellogg assessed disciplinary points against any employee who missed part or all of a scheduled work day without taking paid time off or trading shifts with another employee, or who failed to give adequate notice of an absence: four points for an absence for which the employee did not give Kellogg at least two hours' notice, two points for an absence that was not pre-approved if the employee called in at least two hours before his shift began, and one point for arriving late, leaving early, or taking too long a lunch break. Accumulating too many points would trigger progressive disciplinary measures: Generally ten points would result in a verbal warning, twelve points would result in a written warning, and fourteen points would result in a "final warning." Kellogg would fire an employee if he accumulated sixteen disciplinary points in any twelve-month period, once the progressive disciplinary steps had been exhausted.

4

## A. Richard Tabura

Tabura's job on Shift A was to measure spices. He annually earned 160 hours of paid time off (vacation and sick/personal days), which would cover a little over thirteen of the twenty-six twelve-hour Saturday shifts he would have to work in a year. And if he timely informed Kellogg he was going to take off the other thirteen Saturdays without pay, Tabura would accumulate twenty-six disciplinary points in a twelve-month period, well over the sixteen points that would result in his termination. Tabura, therefore, had to find other qualified workers to swap shifts with him. Tabura was able to arrange only three shift swaps. But those employees either were not qualified to do Tabura's job, or vice versa, so he could not continue swapping with them. When Tabura amassed seventeen disciplinary points in a twelve-month period—many for not working on his Sabbath, but a few for other reasons—and after exhausting the progressive disciplinary steps, Kellogg fired Tabura in March 2012, a year after Kellogg went to "continuous crewing."

## B. Guadalupe Diaz

Diaz worked on Shift A placing frozen vegetarian burgers in bags and conducting quality control. She earned 200 hours of paid time off each year (vacation and sick/personal days), which would almost cover seventeen of the twenty-six Saturdays she had to work each year.[1] And if she timely informed

---

[1] In their appellate brief, Plaintiffs assert that Tabura and Diaz each had 160 hours of paid time off, citing Kellogg's policy manual. But the parties' undisputed facts before the district court indicated, instead, that Diaz earned 200 hours paid time off annually.

5

Kellogg that she was going to take the remaining nine Saturdays off without pay, Diaz would accumulate eighteen disciplinary points within a twelve-month period, just over the sixteen points for which Kellogg would fire her.

When Kellogg first went to "continuous crewing," Diaz arranged to swap her Saturday shifts for the Sunday shifts assigned to another employee who observed the Sabbath on Sunday. That worked well for several months until the other employee left Kellogg. After that, Diaz spoke to several other employees about swapping shifts, without luck. At one point, she was able to arrange for another employee to cover her shift for a single Saturday.

Diaz refused to use her vacation and paid time off in order to avoid working on Saturdays. She chose, instead, to use her vacation time to visit her gravely ill sister, and to save her sick time for when she was ill. After Diaz accumulated more than sixteen disciplinary points for missing Saturday shifts, and after she exhausted the progressive discipline steps, Kellogg fired Diaz in May 2012.

## C. This litigation

Plaintiffs sued Kellogg under Title VII, 42 U.S.C. §§ 2000e through 2000e-17, asserting three claims for relief: 1) disparate treatment based on religion; 2) failure to accommodate Plaintiffs' Sabbath observance; and 3) retaliation. The parties filed cross-motions for summary judgment. The district court denied Plaintiffs' motion and granted Kellogg summary judgment on each of these three claims. On appeal, Plaintiffs challenge the district court's rulings only as to their failure-to-accommodate claim. They argue that the district court erred both in granting Kellogg

6

summary judgment on that claim and in denying Plaintiffs summary judgment.[2]  As explained below, we conclude that neither side is entitled to summary judgment.

## II. STANDARD OF REVIEW

This court reviews the district court's summary judgment decisions de novo. See Owings v. United of Omaha Life Ins. Co., 873 F.3d 1206, 1212 (10th Cir. 2017). A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "Where, as here, we are presented with cross-motions for summary judgment, we must view each motion separately, in the light most favorable to the non-moving party, and draw all reasonable inferences in that party's favor."  Fox v. Transam Leasing, Inc., 839 F.3d 1209, 1213 (10th Cir. 2016) (internal quotation marks omitted).

## III. DISCUSSION

Title VII makes it "unlawful . . . for an employer . . . to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . religion . . . ."  42 U.S.C. § 2000e-2(a)(1).  "The term 'religion' includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate . . . an employee's or prospective

---

[2] On appeal, the Equal Employment Opportunity Commission ("EEOC") filed an amicus brief on Plaintiffs' behalf and participated in oral argument.

7

employee's religious observance or practice without undue hardship on the conduct of the employer's business." Id. § 2000e(j). Title VII, thus, requires that "an employer, short of 'undue hardship,' make 'reasonable accommodations' to the religious needs of its employees." Trans World Airlines, Inc. v. Hardison, 432 U.S. 63, 66 (1977) ("TWA").[3]

The questions presented here, then, are whether Kellogg reasonably accommodated Plaintiffs' religious practice of not working on their Sabbath and, if not, whether Kellogg could have done so without undue hardship to its business. A version of the McDonnell Douglas[4] burden-shifting analysis aids us in addressing these questions. See Thomas v. Nat'l Ass'n of Letter Carriers, 225 F.3d 1149, 1155-56 & 1155 n.6 (10th Cir. 2000). At the first step of that analysis, it is the employee's burden to establish a prima facie claim by showing that 1) the employee has a bona fide religious belief that conflicts with a job requirement, 2) the employee informed the employer of this conflict; and 3) the employer fired the employee for failing to comply with the job requirement. See id. at 1155. The parties do not challenge this rendition of a prima facie failure-to-accommodate claim.

---

[3] The Supreme Court, in EEOC v. Abercrombie & Fitch Stores, Inc., 135 S. Ct. 2028, 2031-32 (2015), indicated that a "failure to accommodate" claim is a claim for "disparate treatment" and thus must ultimately satisfy the general elements of a "disparate treatment" claim.

[4] McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).

8

Here, Kellogg assumed, for purposes of summary judgment, that Plaintiffs each made a prima facie failure-to-accommodate claim: 1) Each Plaintiff has a bona fide religious practice—observing the Sabbath by refraining from work, beginning on Friday at sundown through sundown on Saturday—that conflicted with Kellogg's requirement that its production employees work every other Saturday; 2) each Plaintiff informed Kellogg of this conflict; and 3) Kellogg fired Plaintiffs for failing to work their scheduled Saturday shifts.[5] The district court accepted Kellogg's limited concession, for summary judgment purposes, that each Plaintiff established a prima facie claim; we do, too, for purposes of this appeal. See Lee v. ABF Freight Sys., Inc., 22 F.3d 1019, 1022 (10th Cir. 1994).

The burden then shifted to Kellogg 1) to rebut an element of Plaintiffs' prima facie claims; 2) to show that it provided a reasonable accommodation for Plaintiffs' religious practice; or 3) to show that it could not offer a reasonable accommodation without undue hardship. Thomas, 225 F.3d at 1156. In granting Kellogg summary

---

[5] Despite conceding that each Plaintiff made a prima facie claim, on appeal Kellogg points out that it fired Tabura after he amassed more than sixteen disciplinary points, and Kellogg assessed the last two points, not when Tabura missed a Saturday shift, but instead when he clocked in late after lunch on two occasions. Even so, there is evidence in the record from which a jury could find that all but two of the sixteen disciplinary points leading to Tabura's termination were for missing his Saturday shifts. Moreover, other circuits conclude that a plaintiff can satisfy the third prong of his prima facie claim by showing he was disciplined or threatened with termination, rather than actually being fired, for failing to comply with a work requirement that conflicts with his religious practice. See, e.g., Baker v. Home Depot, 445 F.3d 541, 546 (2d Cir. 2006); Cooper v. Oak Rubber Co., 15 F.3d 1375, 1379 n.1 (6th Cir. 1994). We do not have to rule definitively on that issue, however, because in any event, Kellogg cannot now retract its concession in the district court that, for purposes of the summary-judgment motions, Tabura made a prima facie claim.

9

judgment, the district court concluded, as a matter of law, that Kellogg reasonably accommodated Plaintiffs' Sabbath observance and, alternatively, that Kellogg would incur an undue hardship if it further accommodated their religious practice. We disagree on both counts.

## A. Reasonable accommodation

### 1. Relevant law

#### a. Reasonableness of an accommodation

Title VII requires that "an employer, short of 'undue hardship,' make 'reasonable accommodations' to the religious needs of its employees." TWA, 432 U.S. at 66. "Accommodate . . . means . . . allowing the plaintiff to engage in her religious practice despite the employer's normal rules to the contrary." Abercrombie & Fitch, 135 S. Ct. at 2032 n.2; see also US Airways v. Barnett, 535 U.S. 391, 400 (2002) (Americans with Disabilities Act ("ADA") case).

In this case, an accommodation will not be reasonable if it only provides Plaintiffs an opportunity to avoid working on some, but not all, Saturdays. See Ansonia Bd. of Educ. v. Philbrook, 479 U.S. 60, 70 (1986). Nor would it be reasonable if Kellogg only provided Plaintiffs with an opportunity to delay their eventual termination. See id. at 70-71; see also Pinsker v. Joint Dist. No. 28J of Adams & Arapahoe Cntys., 735 F.2d 388, 390-91 (10th Cir. 1984) (upholding trial court's finding that employer's leave policy reasonably accommodated employee's need not to work on several holy days where the policy "jeopardized neither [the employee's] job nor his observation of religious holidays").

10

On the other hand, to be reasonable, an accommodation need not provide a "total" accommodation; that is, Kellogg is not required to guarantee Plaintiffs will never be scheduled for a Saturday shift, nor is Kellogg required to provide an accommodation "that spares the employee any cost whatsoever," Pinsker, 735 F.2d at 390-91; see also Brener v. Diagnostic Ctr. Hosp., 671 F.2d 141, 145-46 & 146 n.3 (5th Cir. 1982) (holding that, although "[o]f course, an employee is not required to modify his religious beliefs," "[a] reasonable accommodation need not be on the employee's terms, only").

"[A]ny reasonable accommodation by the employer is sufficient to meet its accommodation obligation." Ansonia, 479 U.S. at 68. An employee is not entitled to the accommodation of his choice. Id. Once the employer has provided a reasonable accommodation, it "need not further show that each of the employee's alternative accommodations would result in undue hardship." Id.

### b. Inapplicable or unhelpful tests proposed by the parties

Plaintiffs and Amicus EEOC attempt to engraft additional broad rules that would complicate this otherwise straightforward case-specific analysis. We decline to adopt their proffered per se rules, at least in the factual context of this case. Nor do we agree with Plaintiffs and the EEOC that the Supreme Court has, in Abercrombie & Fitch, changed the straightforward statutory analysis called for here.

11

### i. Analyzing whether a reasonable accommodation is a "complete" or "total" accommodation is not helpful here

Plaintiffs and Amicus EEOC first invite this circuit to adopt a per se rule, which they contend several other circuits already employ, requiring that, to be reasonable, an accommodation must "eliminate" the conflict between the employee's religious practice and his work requirements. At times, Plaintiffs add adjectives, arguing an accommodation must "actually" or "totally" or "fully and completely" eliminate a conflict. (Aplt. App. 88-90, 93, 335; Aplt. Br. 34, 39.) But Title VII expressly requires only that an employer "reasonably accommodate" an employee's religion, 42 U.S.C. § 2000e(j). See EEOC v. Firestone Fibers & Textiles Co., 515 F.3d 307, 313 (4th Cir. 2008) (rejecting argument that Title VII requires employer "to totally accommodate" employee's religious practices). Determining what is reasonable is a fact-specific determination that must be made on a case-by-case basis, Thomas, 225 F.3d at 1157 n.8. Plaintiffs' absolute rule would read "reasonably" out of the statute. Adopting a per se "elimination" rule that applies across all circumstances is not helpful to determining whether an accommodation is reasonable. Instead it unnecessarily complicates the question of reasonableness and begs additional questions, including what is meant by "eliminate" or "totally" eliminate or "completely" eliminate.

This total elimination idea stems from general language in Ansonia indicating that an accommodation that "eliminates the conflict between employment

12

requirements and religious practices" would be reasonable. 479 U.S. at 70.[6] The

Court, however, in <u>Ansonia</u> did not hold the reciprocal, that an accommodation could

never be reasonable if it failed totally and under every conceivable fact scenario to

eliminate every conflict or all tension between reasonable work requirements and

religious observation. In fact, few things in life can be conflict-free and Title VII

requires only a reasonable accommodation between religion and employment

obligations. <u>See</u> <u>Sturgill v. United Parcel Serv., Inc.</u>, 512 F.3d 1024, 1030-31 (8th

Cir. 2008).[7]

Furthermore, the Supreme Court in <u>Ansonia</u> did not require an accommodation

to be without cost to the employee. In <u>Ansonia</u>, an employee needed six days off for

religious observance. 479 U.S. at 62-63. The governing collective bargaining

agreement provided employees with three paid days off for religious observance, but

prohibited an employee from using other paid time off for religious reasons. <u>Id.</u> at

63-64. The Supreme Court ultimately remanded that case for further factual inquiry

---

[6] The EEOC also points to its own compliance manual, which "states that an
'[e]mployer violates Title VII if it offers only a partial accommodation where full
accommodation would not pose an undue hardship.'" (EEOC Br. 11 (quoting EEOC
Compliance Manual § 12 (Religious Discrimination) (July 22, 2008))). We consider
this argument, too, although the EEOC's Compliance Manual "is not entitled to
special deference." <u>EEOC v. Tricore Reference Labs.</u>, 849 F.3d 929, 939 (10th Cir.
2017).

[7] <u>Sturgill</u> held that "[w]hat is reasonable depends on the totality of the circumstances
and therefore might, or might not, require elimination of a particular, fact-specific
conflict." 512 F.3d at 1030. The First Circuit has cited <u>Sturgill</u> and this standard.
<u>See</u> <u>Sanchez-Rodriguez v. AT&T Mobility Puerto Rico, Inc.</u>, 673 F.3d 1, 12 (1st Cir.
2012). In addition, the Fourth Circuit, as previously mentioned, has rejected the
"elimination" standard. <u>See</u> <u>Firestone Fibers & Textiles</u>, 515 F.3d at 313.

13

into whether the employer's accommodation was reasonable. Id. at 66, 70. In doing so, however, the Court importantly noted that the employer's policy of requiring an employee

> to take unpaid leave for holy day observance that exceeded the amount allowed by the collective-bargaining agreement, would generally be a reasonable one. In enacting [42 U.S.C. § 2000e(j)], Congress was understandably motivated by a desire to assure the individual additional opportunity to observe religious practices, but it did not impose a duty on the employer to accommodate at all costs. [TWA], 432 U.S. 63 . . . (1977). The provision of unpaid leave eliminates the conflict between employment requirements and religious practices by allowing the individual to observe fully religious holy days and requires him only to give up compensation for a day that he did not in fact work. Generally speaking, "[t]he direct effect of [unpaid leave] is merely a loss of income for the period the employee is not at work; such an exclusion has no direct effect upon either employment opportunities or job status." Nashville Gas Co. v. Satty, 434 U.S. 136, 145 . . . (1977).

Ansonia, 479 U.S. at 70-71 (emphasis added; citing TWA, 432 U.S. 63).

Several circuits have applied this "elimination" language in a specialized context where an employee had two religious practices that conflicted with his job requirements, but the employer attempted to accommodate only one of those two practices. For example, in Smith v. Pyro Mining Co., the Sixth Circuit held that, while the employer attempted to accommodate its employee's religious practice of not working on the Sabbath, by permitting the employee to ask others to trade shifts, the employer did not attempt to accommodate the employee's second conflict, his religious belief that it is a sin to ask others to work on the Sabbath. 827 F.2d 1081, 1088 (6th Cir. 1987). Thus, the Sixth Circuit concluded the employer's attempted

14

accommodation in that case failed to eliminate both conflicts. Id.[8] References to "eliminate," as well as "partial" or "incomplete" accommodations make sense in the situations addressed by these cases, but that is not the situation here, where Plaintiffs have only a single conflict.

Some cases invoking the "elimination" language do so in the unremarkable situation where the accommodation does eliminate the conflict.[9] In Cosme v. Henderson, on the other hand, the Second Circuit held that "to be reasonable" under Title VII "the proposed accommodation had to have eliminated the conflict." 287 F.3d 152, 159 (2d Cir. 2002). Even so, the Second Circuit went on to consider whether other factors, nevertheless, would make unreasonable an accommodation that eliminated the conflict. Id. at 159-60 (ultimately upholding district court's finding, made after bench trial, that employer reasonably accommodated employee's

_____

[8] See also Baker v. Home Depot, Inc., 445 F.3d 541, 547-48 (2d Cir. 2006) (holding scheduling employee for later shift on Sunday so he could attend church did not eliminate conflict with his second religious practice of not working at all on Sunday, his Sabbath); Cooper, 15 F.3d at 1379 (6th Cir.) (same); EEOC v. Universal Mfg. Corp., 914 F.2d 71, 73-74 (5th Cir. 1990) (holding employer did not reasonably accommodate employee's religious practices, where employer accommodated employee's request to attend religious festival during scheduled work shift but did not address employee's second religious practice of refraining from work during the week of the festival).

[9] See Porter v. City of Chi., 700 F.3d 944, 951-53 (7th Cir. 2012) (holding accommodation—changing to late shift—that eliminated conflict by allowing employee to attend religious services was reasonable); Rodriguez v. Chi., 156 F.3d 771, 775-76 (7th Cir. 1998) (holding police department's offer for officer, who objected for religious reasons to being assigned to guard abortion clinic, to transfer to another district that would not require such duty was a reasonable accommodation because it would have eliminated conflict).

15

Sabbath observance).  Still other courts simply invoke <u>Ansonia</u>'s language that a reasonable accommodation eliminates the conflict, generally and without further elaboration, and then consider more specifically, as we do here, whether the accommodation at issue was reasonable under the circumstances of that particular case, without further applying the term "eliminate."[10]

In sum, courts applying language indicating that, to be reasonable, an accommodation must "eliminate" a conflict have done so in different ways.  Further, in most cases it is not clear that these courts reached any different result than if they simply considered whether the accommodation was reasonable.  In <u>EEOC v. Ilona of Hungary, Inc.</u>, for example, the Seventh Circuit held that offering Jewish employees another day off instead of allowing them to take off Yom Kippur was not a reasonable accommodation "because it does not eliminate the conflict between the employment requirement and the religious practice."  108 F.3d 1569, 1576 (7th Cir. 1996).  We doubt if that case would have come out differently if the court simply considered whether the employer's proffered accommodation was reasonable.

---

[10] <u>See</u> <u>Walden v. Ctrs. for Disease Control & Prevention</u>, 669 F.3d 1277, 1293 (11th Cir. 2012) (holding, after stating that a reasonable accommodation eliminates the conflict, that employer reasonably accommodated employee counselor, whose religious views precluded her from counselling individuals involved in a same sex romantic relationship, by removing employee from counselling position and offering to help her find new, non-counselling position within the agency); <u>Morrissette-Brown v. Mobile Infirmary Med. Ctr.</u>, 506 F.3d 1317, 1318, 1320-24 (11th Cir. 2007) (after stating that "a reasonable accommodation is one that eliminates the conflict," upholding district court's factual finding, made after bench trial, that employer reasonably accommodated employee's Sabbath observance through, among other things, rotating shifts and by permitting employee to swap shifts and providing her with information as to her co-workers' schedules); <u>see also</u> <u>Wright v. Runyon</u>, 2 F.3d 214, 217 (7th Cir. 1993).

16

In any event, we see no need to adopt a per se rule requiring that an accommodation, to be reasonable, must eliminate, or totally eliminate, or completely eliminate, any conflict between an employee's religious practice and his work requirements. The statute requires the accommodation to be reasonable and ultimately the question of whether an accommodation is reasonable must be made on a case-by-case basis, grounded on the specific facts presented by a particular situation. See Thomas, 225 F.3d at 1157 n.8; United States v. City of Albuquerque, 545 F.2d 110, 115 (10th Cir. 1976). Further gloss on that statutory requirement adds only confusion and complexity rather than clarity.

### ii. A neutral employment policy may satisfy the need for a reasonable accommodation

Plaintiffs and Amicus EEOC further suggest another per se rule, that Kellogg cannot accommodate their religious observance only through a neutral policy; that is, by the same policies available to any employee who wanted to take a day off for any reason. In making this argument, Plaintiffs and the EEOC rely on language from Abercrombie & Fitch. But the language on which they rely does not support such a per se rule.

As an initial matter, Abercrombie & Fitch addressed a different issue than we have here. In Abercrombie & Fitch, the issue was one of motivation—specifically, may an employer decline to hire an applicant when the employer is motivated to avoid the future need to accommodate that prospective employee's religious needs. See 135 S. Ct. at 2030-33. Our case, by contrast, presents a question of the

17

effectiveness of the accommodation presented by the employer.  It is readily apparent that those are two different inquiries.

The EEOC and Plaintiffs focus on the following language from Abercrombie & Fitch: After noting that, under Title VII, "religious practice is one of the protected characteristics that cannot be afforded disparate treatment and must be accommodated," the Supreme Court stated

> Nor does the statute limit disparate-treatment claims to only those employer policies that treat religious practices less favorably than similar secular practices. Abercrombie's argument that a neutral policy cannot constitute "intentional discrimination" may make sense in other contexts. But Title VII does not demand mere neutrality with regard to religious practices—that they be treated no worse than other practices. Rather, it gives them favored treatment, affirmatively obligating employers not "to fail or refuse to hire or discharge any individual . . . because of such individual's" "religious observance and practice." An employer is surely entitled to have, for example, a no-headwear policy as an ordinary matter. But when an applicant requires an accommodation as an "aspec[t] of religious . . . practice," it is no response that the subsequent "fail[ure] . . . to hire" was due to an otherwise-neutral policy. Title VII requires otherwise-neutral policies to give way to the need for an accommodation.

Id. at 2034.

This is simply a summary that recognizes an employer cannot take refuge behind a neutral policy if something more is required reasonably to accommodate a religious need.  An employer can, of course, meet its obligation to accommodate its employees' religious practice by using a neutral policy, so long as that policy reasonably accommodates the employee's religious needs.  Nothing in Title VII requires the accommodation uniquely to target a religious concern.  See City of Albuquerque, 545 F.2d at 113-14 (upholding district court's factual finding that fire

18

department's "fairly liberal time off policy," which was available to any employee, reasonably accommodated fire fighter's weekly Sabbath observance). But, on the other hand, if a general policy does not amount to a reasonable accommodation of the employee's religious needs, then merely having a neutral employment policy will not absolve the employer of its Title VII obligation reasonably to accommodate its employee's religious practices (short of an undue hardship). See Barnett, 535 U.S. at 397-98 (addressing reasonable accommodation under the ADA). "Were that not so, the 'reasonable accommodation' [requirement] could not accomplish its intended objective." Id.; see also Abercrombie & Fitch, 135 S. Ct. at 2034 ("Title VII requires otherwise-neutral policies to give way to the need for an accommodation.").

**2. Applying this relevant law to this case**

We turn, then, to the specific circumstances at issue here, asking, as Title VII directs, whether Kellogg reasonably accommodated Plaintiffs' conflict between observing the Sabbath and their work schedules. Kellogg sought to accommodate Plaintiffs' Sabbath observance through a combination of allowing them to use their vacation and other paid time off, as well as permitting Plaintiffs to swap shifts with other employees. Such a combination might, under the facts of a particular case, reasonably accommodate an employee's Sabbath observance. See Thomas, 225 F.3d at 1156-57; City of Albuquerque, 545 F.2d at 113-14. But whether an accommodation is reasonable in a given circumstance is ordinarily a question of fact to be decided by the fact finder. See City of Albuquerque, 545 F.2d at 114-15;

19

Williams v. S. Union Gas Co., 529 F.2d 483, 488 (10th Cir. 1976).  That is the case here.[11]

Subject to a reasonableness analysis, an employee may be required to use vacation or other paid time off to avoid conflict with religious obligations.  See City of Albuquerque, 545 F.2d at 113-14 (10th Cir.).  Here, however, even if Plaintiffs used all of their vacation and other paid time off, that would still have been insufficient to avoid working some scheduled Saturdays, even when considered along with accruing disciplinary points short of termination.  Kellogg, of course, also permitted Plaintiffs to swap shifts with others to avoid working their Sabbath.  The reasonableness of the shift-swapping accommodation, however, as well as the reasonableness of the combination of taking paid time off and swapping shifts, are critical disputed issues of material fact in this case that a jury must resolve.

---

[11] Based on this Court's earlier decisions in City of Albuquerque and Thomas, Kellogg incorrectly asserts a per se rule that the accommodations it offered Plaintiffs are reasonable as a matter of law.  In City of Albuquerque, however, this Court upheld the district court's factual finding, made after a trial, that the fire department reasonably accommodated its employee's Sabbath observance.  545 F.2d at 111, 113-14.  In Thomas, this Court affirmed summary judgment for the employer (without requiring a trial) where the employer permitted the employee to use paid leave to avoid working on his Sabbath, would have approved voluntary shift swaps when the employee could arrange them, and unsuccessfully sought a waiver from the union to change his schedule.  225 F.3d at 1156.  In Thomas, however, it was undisputed that the additional accommodations the employee suggested that would enable him to avoid having to work any Sabbath would have violated an agreement between the union and the employer.  See id. at 1156-57.  And Title VII's requirement that an employer reasonably accommodate an employee's religious practices does not obligate the employer to violate a collective bargaining agreement.  See TWA, 432 U.S. at 83 n.14.  Here, by contrast, there is no collective bargaining agreement that restricts the accommodations Kellogg can offer.

Those disputes are, in part, informed by the disputed facts surrounding the difficulty Plaintiffs had in arranging voluntary swaps with other, qualified employees in the context of Kellogg's "continuous crewing" employment practice. See McGuire v. Gen. Motors Corp., 956 F.2d 607, 608-10 (6th Cir. 1992) (reversing summary judgment and remanding for trial on question of whether employer's accommodation, that permitted employee to swap shifts in order to avoid working on his Sabbath, was reasonable in light of demonstrated difficulty employee had in arranging such voluntary shift swaps).

There is evidence indicating that the universe of qualified employees with whom each Plaintiff could swap shifts was quite limited. Plaintiffs could not swap shifts with anyone on Shift C. Kellogg's management further acknowledged it would have been "challenging" for Plaintiffs to swap with anyone on the other night shift, D Shift. (Aplt. App. 971.) (In fact, Tabura testified that his supervisor told Tabura that he could not swap with D Shift workers.) That left B Shift.

Tabura went to the plant during B Shift and sought to trade shifts with those workers and further asked Shift B supervisors if they knew of any employees who might be willing to swap shifts. But there were only approximately twelve to fifteen processing employees, like Tabura, on a shift. Furthermore, processing workers were not trained and qualified to perform all processing jobs. To become qualified to perform a particular job, an employee had to apply, be selected, and then study and train for two to four weeks before passing a test. Tabura identified three qualified spice room technicians that he asked to trade shifts; they each usually declined.

21

Tabura was able to arrange a total of three swaps, but it turned out he was unable to do the jobs of two of those three swapping employees.

As for Diaz, there were similarly only about twelve to fifteen packaging employees like her on a shift. Those employees, too, had to be trained and certified for their particular jobs and were not cross-trained on every packaging job. Diaz testified that she knew of four employees who were qualified to do her job, but only two were on shifts other than hers. As soon as Kellogg announced it was going to go to "continuous crewing," Diaz arranged to swap shifts with one of those four qualified employees—the Shift B employee who observed the Sabbath on Sundays—until that employee left the company. Other than those swaps, however, Diaz was only able to arrange for another worker to cover one other Saturday for her.

There is also disputed evidence as to how helpful Kellogg was in facilitating these swap arrangements. For example, Plaintiffs' immediate supervisor Dean Shirra indicated that he gave Tabura several names of employees Tabura could speak with about trading shifts, but Shirra did not recall when he gave Tabura those names or how many names he gave Tabura. Moreover, Tabura testified that he had already asked all of the people Shirra listed as possible swaps, without success, and when he explained that to Shirra, the supervisor offered no further help. Diaz, too, testified that the only name Shirra gave her to ask about swapping shifts was someone she had already asked.

Although, under the undisputed facts presented in Thomas, we rejected the argument that the employer in that case "should have provided more active assistance

22

in helping [the employee] locate a 'voluntary permanent swap' for Saturdays," we also recognized that there may be facts present in a given case that could "require an employer to take a more active role in securing a voluntary swap for the employee." 225 F.3d at 1156-57 & 1157 n.8. On the record here, we think a jury could find that, in light of the difficulties Plaintiffs had in arranging shift swaps in this case, Kellogg had to take a more active role in helping arrange swaps in order for that to be a reasonable accommodation of Plaintiffs' Sabbath observance.

Of course, an employee has a duty to cooperate with his employer's attempts to accommodate the employee's religious practices. See Toledo v. Nobel-Sysco, Inc., 892 F.2d 1481, 1488 (10th Cir. 1989) (citing Ansonia, 479 U.S. at 69); see also Lee 22 F.3d at 1022. As to that question, too, there remain genuinely disputed issues of material fact. Kellogg contends, for example, that Plaintiffs really made no effort to use the accommodations Kellogg offered them. But Plaintiffs provided evidence that they did make some attempts, for example, to seek out approvable shift swaps. A jury will have to decide to what extent Plaintiffs attempted to use the accommodations Kellogg provided and whether any such efforts satisfied Plaintiffs' reasonable duty to cooperate. See Beadle v. Hillsborough Cnty. Sheriff's Dep't, 29 F.3d 589, 593 (11th Cir. 1994) (upholding factual finding, after trial, that the employee "failed to take full advantage" of the shift-swapping accommodation offered by the employer); Brener, 671 F.2d at 143, 145 (5th Cir.) (upholding trial court's factual finding that employee "made only haphazard efforts to arrange schedule trades," which was one of the accommodations the employer provided to

23

permit the employee to observe his Sabbath and religious holy days); McGuire, 956

F.2d at 610 (6th Cir.) (reversing summary judgment for employer and remanding for

trial in part on disputed fact question of whether employee failed to seek voluntary

swaps, which were part of the accommodation his employer provided).

The above recitation makes it clear that in this case there are a multitude of

genuinely disputed material facts regarding whether Kellogg reasonably

accommodated Plaintiffs' Sabbath observance.[12]  In light of that, neither Kellogg nor

Plaintiffs are entitled to summary judgment on this defense.

## B. Undue hardship

Kellogg also pled the affirmative defense that any additional accommodation

of Plaintiffs' Sabbath observance would cause undue hardship to Kellogg's business.

The district court alternatively granted Kellogg summary judgment on that defense.

An employer incurs an undue hardship if it must "bear more than a de minimis cost in

order to give [an employee] Saturdays off" to observe his Sabbath.  TWA, 432 U.S.

---

[12] There are many other factual discrepancies throughout the record that may also prove to be material.  For example, although Kellogg asserts it accommodated Plaintiffs, in part, by letting them use vacation and other paid time off to avoid working Saturdays, Tabura testified in his deposition that his supervisor Shirra did not tell Tabura he could use vacation time until after Tabura had already accumulated ten disciplinary points for missing his Saturday shifts.  And, according to Tabura, Supervisor Shirra never told Tabura he could also use sick time to avoid working on Saturdays, although there appears to be conflicting evidence on this point as well. Further, while there is evidence Plaintiffs informed Kellogg of their need for a religious accommodation, and Kellogg conceded as much for summary-judgment purposes, Plaintiffs' supervisor testified in his deposition that he was unaware that Tabura needed to avoid working Saturday shifts for religious reasons until Supervisor Shirra gave Tabura a verbal warning after he accumulated ten disciplinary points. Furthermore, Shirra testified he was never aware that Diaz needed to avoid working Saturdays for religious reasons.

at 84.  "Any cost in efficiency or wage expenditure that is more than de minimis constitutes undue hardship.  The cost of hiring an additional worker or the loss of production that results from not replacing a worker who is unavailable due to a religious conflict can amount to undue hardship."  Lee, 22 F.3d at 1023 (internal quotation marks, citation omitted); see also TWA, 432 U.S. at 84.  It is the employer's burden to show that it cannot offer a reasonable accommodation without undue hardship.  See Thomas, 225 F.3d at 1156.  Whether an employer will incur an undue hardship is a fact question, see Williams, 529 F.2d at 488, that turns on "the particular factual context of each case," Toledo, 892 F.2d at 1490 (internal quotation marks omitted).

Here, we have several concerns about upholding summary judgment for Kellogg on its undue-hardship defense.  First and foremost, while Kellogg pled that affirmative defense, Kellogg did not move for summary judgment on it.  Even so, the district court can grant summary judgment on that basis if the court first gives the parties "notice and a reasonable time to respond."  Fed. R. Civ. P. 56(f)(2).  But the court did not give notice in this case.  The parties, therefore, were not on notice to put forth all of their evidence pertaining to Kellogg's undue-hardship defense.  Plaintiffs, in moving for summary judgment, did address the undue-hardship question to some extent, proffering ways Kellogg might have accommodated them without apparent undue hardship.  But they did so expressly in light of the fact that, at trial, it was Kellogg who would bear the burden of proving its undue-hardship defense.  Kellogg, for its part, in opposing summary judgment for Plaintiffs, asserted only that "several

25

of Plaintiffs' proposed alternative accommodations would create significant burdens on the company in the form of unauthorized overtime, quality control issues, and even forcing entire lines to shut down." (Aplt. App. 254.) Kellogg did not otherwise cite to any evidence to support its assertions. The parties, therefore, did not put forth all of their evidence on Kellogg's undue-hardship defense. Given these concerns, summary judgment was not warranted for either side on the record before us.

## IV. CONCLUSION

Plaintiffs' religious practice of weekly observing the Sabbath by refraining from work from sundown Friday through sunset Saturday conflicted with Kellogg's requirement that its production employees work every other Saturday. Title VII required Kellogg reasonably to accommodate Plaintiffs' religious practice, if Kellogg could do so without incurring undue hardship to its business. Whether Kellogg reasonably accommodated Plaintiffs' Sabbath observance and, if not, whether Kellogg could do so without undue hardship, must await further proceedings. We, therefore, REVERSE the district court's decision granting Kellogg summary judgment on Plaintiffs' failure-to-accommodate claims and REMAND for further proceedings consistent with this opinion.